

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-2002

# USA v. Johnson

Precedential or Non-Precedential: Precedential

Docket No. 00-2165

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Johnson" (2002). *2002 Decisions.* Paper 535.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/535

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 26, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-2165 / 01-2529

UNITED STATES OF AMERICA

v.

GENE BARRETT JOHNSON,
a/k/a Gexex Johnson,
        Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 98-cr-00158)
District Judge: Honorable A. Richard Caputo

Submitted Under Third Circuit LAR 34.1(a)
February 8, 2002

Before: SLOVITER, and AMBRO, Circuit Judges
SHADUR*, District Judge

(Filed: August 26, 2002)

_____
* Honorable Milton I. Shadur, United States District Judge for the
        Northern District of Illinois, sitting by designation.


        Joseph R. D'Andrea, Esquire
        142 North Washington Avenue,
         Suite 800
        Penn Security Bank Building
        Scranton, PA 18503

         Attorney for Appellant in
        No. 00-2165

        James A. Swetz, Esquire
        Cramer, Swetz & McManus
        711 Sarah Street
        Stroudsbrug, PA 18360

         Attorney for Appellant in
        No. 01-2529

        William S. Houser, Esquire
        Office of the United States Attorney
        235 North Washington Avenue -
         Suite 311
        Scranton, PA 18501

         Attorney for Appellee

OPINION OF THE COURT

AMBRO, Circuit Judge:

In these consolidated appeals arising from two separate trials, Gene Barrett Johnson appeals his conviction and sentence on four counts (one in his first trial, three in his second) of violating 21 U.S.C. S 841(a)(1) by possessing drugs with the intent to distribute them. In No. 00-2165, Johnson contends that the District Court should have ordered the Government to reveal the identity of a confidential informant who did not participate in or witness the offense. In No. 01-2529, Johnson argues that: (1) the evidence was insufficient to support his conviction on any of the three counts; (2) the District Court abused its discretion by refusing to grant his new trial motion; (3) the prosecutor violated his right to due process by asking a

2

question that may have implicated his right to remain silent after being arrested and given Miranda warnings; (4) the prosecutor committed misconduct by asking a defense witness about Johnson's prior bad acts; (5) the prosecutor improperly commented on Johnson's status as a fugitive in response to defense counsel's argument that it made no sense that he would leave drug-filled bags at the residence of a woman he met at a nightclub; (6) the Court abused its discretion by allowing the prosecutor to impeach Johnson and another defense witness with evidence that they were convicted felons; (7) the Court improperly imposed a two-level sentencing enhancement for obstruction of justice after finding that Johnson committed perjury during several portions of his trial testimony; and (8) the Court mistakenly imposed a two-level sentencing enhancement for possession of a firearm because Johnson had a loaded revolver in the same bag as his drugs.

We conclude that the District Court correctly rejected eight of Johnson's nine claims. However, the Court overlooked Greer v. Miller, 483 U.S. 756 (1987), in finding that a due process violation--which it ultimately deemed harmless--occurred when the prosecutor asked a question that implicated Johnson's post-arrest, post-Miranda-warnings silence. Under Greer, the prosecutor's question did not violate due process. On that understanding, we affirm.

I. Background

On June 26, 1998, as part of a joint investigation conducted by the Drug Enforcement Agency ("DEA") and the Pennsylvania State Troopers into crack cocaine dealing in Lackawanna County, Pennsylvania, an undercover trooper and a confidential informant visited the residence of Sandra Osborne, a suspected crack user and seller, to make a purchase. After the confidential informant introduced Osborne to the trooper, Osborne and the trooper drove away in the trooper's unmarked vehicle, and the informant stayed at Osborne's residence to babysit her

young child. Following unsuccessful searches for crack cocaine at a residence and mall in Scranton, Osborne met two men, who were later identified as Johnson and Jamahl

Simmons, on the street near the mall. Osborne and the two men got into the trooper's vehicle.

At Osborne's request, the undercover trooper drove them to a nearby strip club. On the way, the trooper saw and heard Johnson counting out fourteen bags of crack cocaine. When Osborne complained that the rocks of crack were too small, Johnson replied that "these are the biggest [expletive] rocks in Scranton." Johnson then handed the fourteen bags to Osborne in exchange for $200 in cash that the trooper gave her earlier. Osborne took four of the bags and gave the other ten to the trooper. The trooper's ten bags were later found to contain .81 gram of crack cocaine. Upon arriving at the strip club, Johnson gave his pager number to the trooper and Osborne. Johnson told the trooper he wanted to give him a "deal" for $300 in cash. Johnson and Simmons then left the vehicle, and the trooper drove Osborne back to her home.

After Johnson and Simmons exited the vehicle, a DEA agent approached them on the street and identified himself as a law enforcement officer. Johnson and Simmons attempted to flee. As they ran, Johnson threw money and a cigarette pack on the ground, and Simmons threw a bag on the ground. The money was later determined to contain identifiable bills used to purchase the crack cocaine, and the cigarette pack was found to contain .35 gram of cocaine and 1.69 grams of marijuana. The bag that Simmons threw on the ground contained 1.76 grams of crack cocaine, 2.19 grams of cocaine, and 2.93 grams of marijuana. DEA agents quickly caught Johnson and Simmons and arrested them. A search of Johnson's person incident to the arrest uncovered nineteen ziplock bags containing 1.96 grams of crack cocaine. Johnson falsely identified himself as"Gexex Johnson" to the agents, and later to probation officers and the District Court.

On June 30, 1998, a federal grand jury indicted Johnson and Simmons for conspiracy to distribute and possess with intent to distribute crack cocaine in violation of 21 U.S.C. S 846, and also indicted Johnson for possession with intent to distribute crack cocaine in violation of 21 U.S.C. S 841(a)(1). On July 14, 1998, Johnson was released on his own recognizance. He signed "Gexex Johnson" on his

conditions of release form. On March 10, 1999, Johnson was scheduled to appear before the District Court to enter a guilty plea. When he failed to appear, the Court issued a warrant for the arrest of "Gexex Johnson."

On May 27, 1999, United States Marshals went to a residence in Edwardsville, Pennsylvania, upon receiving information that Johnson was there. When the marshals arrived, they saw Johnson entering a taxi outside the residence. A woman later identified as Jozette Sey was sitting in the back seat. The marshals approached the taxi with their guns drawn and ordered Johnson and Sey to show their hands and exit the vehicle. Sey immediately raised her hands, but Johnson, despite being ordered four or five times by the marshals to display his hands, did not comply. Instead, he turned his back to the marshals and appeared to move his hand either inside his jacket or toward the back seat cushions. Eventually, Johnson displayed his hands, but still failed to raise them. A marshal opened the taxi door and ordered Johnson to come out, but he refused. The marshals then physically removed him from the taxi, restrained him on the ground, and handcuffed him. They told Johnson that he was being arrested pursuant to a warrant for the arrest of"Gexex Johnson." Johnson told the marshals they had the wrong man. Knowing that "Gexex Johnson's" left foot was partially amputated, the marshals removed Johnson's left shoe and confirmed his identity.

Johnson was taken to the Edwardsville Police Department, where officers found sixty-two small plastic bags containing 5.7 grams of crack cocaine in his coat pocket. At the scene of the arrest, marshals discovered fifteen small, yellow plastic bags containing marijuana in the back seat cushions of the taxi. A marshal asked Sey if the marijuana was hers, and she said no. The marshals determined that Sey lived in the residence and asked her whether Johnson left any belongings there. Sey said Johnson left two bags, and let the marshals search her residence to retrieve them. The marshals found the bags on the floor of a bedroom. One bag contained men's clothing. The other contained a loaded .32 caliber revolver, hundreds of empty small plastic bags matching the drug-laden bags

5

found in the back seat of the taxi and in Johnson's coat pocket, approximately twenty-five small bags containing marijuana, approximately forty-five small bags containing crack cocaine, six small bags containing cocaine, three plastic bags containing three "cutting" agents (procaine, lidocaine, and niacinamide), a sifter, a mini-scale capable of ascertaining weight by grams or ounces, and about three hundred dollars in cash. The bag also contained a number of documents, including rap lyrics that Johnson admitted he wrote, and on which a fingerprint of his right index finger was found, a Western Union receipt listing Johnson as the sender and listing the sender's address as his mother's home (where Johnson was supposed to be residing while on pretrial release), credit card applications in various names, and an identification card for"Erica Gray."[1]

On August 10, 1999, a federal grand jury returned a five-count superseding indictment. Count I, which arose from

the events of June 26, 1998, charged Johnson with
possession with intent to distribute crack cocaine in
violation of 21 U.S.C. S 841(a)(1). Counts II through V arose
from the events of May 27, 1999. Counts II through IV
charged Johnson with possessing crack cocaine, cocaine,
and marijuana with intent to distribute in violation of
S 841(a)(1). Count V charged Johnson with possessing a
firearm in furtherance of a drug trafficking felony in
violation of 18 U.S.C. S 924(c).

Johnson's trial on Count I began on February 15, 2000.
He admitted selling crack cocaine to Osborne, but claimed
she entrapped him. He said he sold her crack only because
she was "extremely persistent" in attempting to buy the
drug from him.2 On February 17, 2000, the jury found
Johnson guilty of violating S 841(a)(1). On July 14, 2000,
the District Court sentenced him to fifty-one months in
prison.

_____

1. It is unclear why Johnson had the credit card applications and the
identification card.

2. Similarly, Johnson's brief states that Osborne"hounded him to sell
her crack cocaine," and that "he agreed to participate in the sale of
drugs to get Sandy Osborne to leave him alone." Appellant's Br. at 6-7.

Johnson's trial on Counts II through V began on
September 5, 2000. During the trial, Count V, theS 924(c)
count, was dismissed pursuant to the Government's
motion. With respect to the drug dealing charges, Johnson
insisted that none of the drugs found in his coat, in the
taxi, and in the bags in Sey's bedroom belonged to him. On
September 8, 2000, the jury convicted Johnson on the
three S 841(a)(1) counts. He moved for a judgment of
acquittal or a new trial, which the District Court denied. On
May 24, 2001, the Court sentenced Johnson to 108 months
to be served concurrently with the sentence resulting from
his first trial. Eleven days later, Johnson filed a notice of
appeal.3

II. Discussion

A. The Hale-Doyle Issue

Johnson contends that a question the prosecutor asked
a marshal violated his right to due process by using his
post-arrest, post-Miranda-warnings silence against him.
The District Court agreed, but deemed the violation
harmless. Because it is important to evaluate the
prosecutor's question in context, see Darden v. Wainwright,
477 U.S. 168, 179 (1986), we describe the circumstances
immediately preceding and following the question before
explaining why it did not rise to the level of a due process
violation.

1. The allegedly improper question

As noted above, on May 27, 1999, after Johnson was arrested and taken to the police station, marshals searched his person and found sixty-two plastic bags containing 5.7 grams of crack cocaine in a pocket of the coat Johnson was wearing. At trial, Johnson's counsel asked one of the marshals the following questions on cross-examination:

> Q: And isn't it true that you had difficulty removing that bulge [the bags of crack] from the pocket of the jacket?

_____

3. The District Court had jurisdiction under 18 U.S.C. S 3231. We have jurisdiction under 28 U.S.C. S 1291 and 18 U.S.C. S 3742.

> A: Yes, I did.

> Q: And isn't it true that you asked Mr. Johnson what it [the bulge] was and he said it look [sic] likes [sic] it's in the pocket?

> A: Yes, sir.

> Q: And then you were able to find the pocket and remove the object?

> A: That's correct.

The Government maintains that this line of questioning "suggest[ed] that only after the defendant offered speculation about the location of the bulge was the marshal able to locate it and remove it from the jacket." Appellee's Br. at 40. Shortly after questioning the marshal about the bulge in the jacket, Johnson's counsel asked how Johnson reacted when the marshals found the drugs in the coat pocket:

> Q: And my client's response were, [sic] if those are drugs, somebody else put them in there?

> A: Yes.

In what the Government portrays as an attempt to remove any doubt regarding the jacket's ownership, the prosecutor asked the marshal on redirect examination about Johnson's behavior when the marshal handed him the jacket after removing the drugs:

> Q: After you took the drugs out of Mr. Johnson's coat pocket, you say you gave him back the coat, is that right?

> A: I believe so, yes.

> Q: Did he say, hey, man, that's not my coat?

A: No.

Q: He took the coat?

A: Yes.

After receiving permission to approach the bench, Johnson's counsel objected, stating: "My client has an absolute right to remain silent once he's under arrest." The

District Court agreed and sustained the objection. Following the sidebar conversation, it instructed the jury to disregard the prosecutor's question and the marshal's answer:

> Members of the Jury, as I instructed you and advised you in the beginning, in a criminal case a Defendant is under no obligation or duty to testify. Likewise, a Defendant is under no obligation or duty to respond at any time or to say anything.
>
> In this particular instance the thrust of [the prosecutor's] question, did Mr. Johnson say it was not his coat, was objected to by [defense counsel] and quite properly so. I'm instructing you that that should be disregarded by you as a piece of information in this case or a piece of evidence.
>
> [The prosecutor] is essentially withdrawing that question. So you should strike it from your minds as something that is to be considered in this case.

The prosecutor did not refer again to Johnson's post-arrest silence during the remainder of the trial.

Following the Court's curative instruction, the prosecutor rephrased his line of questioning to demonstrate that the jacket was Johnson's without relying on his post-arrest silence:

> Q: Deputy, after the drugs were taken, did Mr. Johnson continue to wear the coat?
>
> A: Yes.
>
> Q: And when he was sent off to the jail he had the same coat on, correct?
>
> A: Yes.
>
> Q: And the next morning you found him with the same coat, correct?
>
> A: Yes, sir.

In this context, Johnson maintains that the prosecutor's question violated due process. It is not clear from the

record, however, whether Johnson received Miranda

warnings before the marshal removed the drugs from his coat and handed it to him. Surprisingly, neither the District Court's opinion nor either side's brief indicates whether (and, if so, when) Miranda warnings were given. If no Miranda warnings were administered, then Johnson has no due process claim. We discuss this issue in more detail below.

2. The right to remain silent

In United States v. Hale, 422 U.S. 171 (1975), the Supreme Court, exercising its supervisory authority over the federal courts, held that a federal prosecutor cannot cross-examine a defendant about his post-arrest, post-Miranda-warnings silence because its prejudicial effect substantially outweighs its probative value. Id. at 180-81. The Court explained that a defendant's silence in this situation was ambiguous and had little probative value because it "can as easily be taken to indicate reliance on the right to remain silent as to support an inference that [his] explanatory testimony was a later fabrication." Id. at 177. At the same time, it "has a significant potential for prejudice" because the jury is likely to draw a"strong negative inference" from the defendant's failure to immediately tell the police what happened. Id. at 180.

A year later, the Court elevated the Hale rule to constitutional status, holding in Doyle v. Ohio , 426 U.S. 610 (1976), that the Fourteenth Amendment's Due Process Clause bars state prosecutors from using a defendant's post-arrest, post-Miranda-warnings silence to impeach his trial testimony.4 Id. at 618-19. The Court pointed out that because Miranda warnings implicitly assure an arrested person that "silence will carry no penalty,""it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." 5 Id. at 618.

_____

4. While the Court recently said that "there might be reason to reconsider Doyle," Portuondo v. Agard , 529 U.S. 61, 74 (2000), it remains good law for now.

5. However, the Doyle Court said that a prosecutor can use a defendant's post-arrest, post-Miranda-warnings silence"to contradict a defendant

Though Doyle involved a state prosecution, it applies identically to federal prosecutions under the Fifth Amendment. United States v. Balter, 91 F.3d 427, 439 n.9 (3d Cir. 1996) (citation omitted).

The Hale-Doyle rule applies only to post-arrest, post-

Miranda-warnings silence. In Fletcher v. Weir, 455 U.S. 603 (1982) (per curiam), the Supreme Court held that a defendant's post-arrest silence before receiving Miranda warnings can be used for impeachment.6  Id. at 605-07. In doing so, it explained that the Hale-Doyle rule does not apply to the post-arrest, pre-Miranda warnings situation because it is not unfair to use a defendant's silence against him absent the "affirmative assurances embodied in the Miranda warnings." Fletcher, 455 U.S. at 607.

As noted above, it is unclear whether Johnson was given Miranda warnings. But it makes no difference, for either way no due process violation occurred. If Johnson did not receive Miranda warnings, then the prosecutor's question was permissible under Fletcher. See 455 U.S. at 605-07. If he did receive the warnings, the question, though improper,7

---

who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." Doyle, 426 U.S. at 619 n.11. The Court explained that "[i]n that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." Id. (citation omitted). Thus if the defendant "implie[s] that he had consistently offered [to the police] the exculpatory version of events that he offered on the stand," the prosecutor can question him about his post-arrest silence. Earnest v. Dorsey, 87 F.3d 1123, 1135 (10th Cir. 1996).
6. Although the record in Fletcher did not show that the defendant received Miranda warnings, the Supreme Court did not decide whether an appellate court should presume that the warnings were given when the record contains no suggestion that they were. The appellate court had held that "a defendant cannot be impeached by use of his post-arrest silence even if no Miranda warnings had been given." 455 U.S. at 604. Thus the Supreme Court addressed only that question. Id.

7. We note that because Johnson had not yet testified--and thus had not "testifie[d] to an exculpatory version of events and claim[ed] to have told the police the same version upon arrest"--the prosecutor's question was not a permissible use of a defendant's post-arrest silence to "challenge [his] testimony as to his behavior following arrest." Doyle, 426 U.S. at 619 n.11.

11

does not constitute a due process violation under Greer v. Miller, 483 U.S. 756 (1987).8

In Greer, the defendant, who received Miranda warnings when he was arrested, was accused of kidnapping, robbery, and murder. Id. at 758-60. On direct examination, he testified that he was not involved, and that his alleged cohorts confessed to him on the day of the crimes that they were responsible. Id. On cross-examination, the prosecutor asked: "Why didn't you tell this story to anybody when you got arrested?" Id. at 759. Defense counsel objected immediately, and the trial judge "immediately sustained the objection and instructed the jury to 'ignore[the] question, for the time being.' " Id. (alteration in original). Although

defense counsel did not request a more specific instruction, "[t]he prosecutor did not pursue the issue further, nor did he mention it during his closing argument." Id. In addition, "the judge specifically instructed the jury to 'disregard questions . . . to which objections were sustained.' " Id.

The Supreme Court held that "no Doyle violation occurred" because the defendant's post-arrest silence "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." Id. at 764-65. The trial court "explicitly sustained an objection to the only question that touched upon [the defendant's] post-arrest silence," "[n]o further questioning or argument with respect to [the defendant's] silence occurred, and the court specifically advised the jury that it should disregard any

_____

8. Compare United States v. Cummiskey, 728 F.2d 200 (3d Cir. 1984), where the prosecutor "emphasized" the defendant's post-arrest silence "both during the trial and extensively during closing argument," but the record did not show whether Miranda warnings were given. Id. at 204. We determined that if the warnings were given, there was a clear due process violation which could not be deemed harmless error. Id. Therefore, the case turned on whether the defendant received Miranda warnings, and we had to decide whether we could presume that he had. We held that Fletcher, which declined to make such a presumption, "foreclosed" us from doing so. Id. at 204-05. We remanded to give the Government an opportunity to prove that the defendant had not received Miranda warnings. Id. at 206-07.

Unlike Cummiskey, we need not remand this case because no due process violation occurred even if Johnson received Miranda warnings.

12

questions to which an objection was sustained." Id. at 764. In contrast, in the cases that involved a Doyle  violation, "the trial court ha[d] permitted specific inquiry or argument respecting the defendant's post-Miranda silence." Id. (citations omitted).

Under Greer, the prosecutor's question here was not a Doyle violation. Johnson's counsel promptly objected to the question, the District Court immediately sustained the objection and issued a detailed curative instruction, and the prosecutor never mentioned Johnson's post-arrest silence again.9 As in Greer , Johnson's post-arrest silence "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." Greer, 483 U.S. at 764-65. Indeed, there was a stronger argument for a Doyle violation in Greer, where the trial court never explicitly instructed the jury that it could not consider the defendant's post-arrest silence. Here, in contrast, the District Court specifically ordered the jury to disregard the prosecutor's question and admonished it not to consider

_____

9. There are two respects in which the prosecutor's question differs from the question in Greer, but they are immaterial. First, the prosecutor

elicited testimony about Johnson's silence on redirect examination of a Government witness (in response to defense counsel's cross-examination), rather than when cross-examining Johnson. The unduly prejudicial effect of the Government's question--if there was any such effect in spite of the District Court's swift, emphatic response--would be no less damaging if the question had been asked on cross-examination of Johnson. Cf. United States v. Turner, 966 F.2d 440, 442 (8th Cir. 1992) (analyzing prosecutor's references to the defendant's post-arrest, post-Miranda-warnings silence in his opening argument and on direct examination of Government witnesses as if the references were made on cross-examination of the defendant). Second, the marshal answered "No" before Johnson's counsel objected, whereas in Greer defense counsel objected before the defendant could answer the question. However, as the Tenth Circuit recently explained, in Greer the wording of the prosecutor's question--"Why didn't you tell this story to anybody when you got arrested?"--"made plain that the defendant actually had exercised his Miranda rights." United States v. Oliver, 278 F.3d 1035, 1039-40 (10th Cir. 2001). Because in Greer the question itself told the jury that the defendant remained silent, the fact that the marshal answered the prosecutor's question at Johnson's trial fails to distinguish Greer.

13

Johnson's post-arrest silence.10 Together with the immediate objection by Johnson's counsel and the fact that only one question was asked, the Court's prompt, pointed response averted a Doyle breach. See id. ; Balter, 91 F.3d at 439.

One issue remains with respect to the prosecutor's possibly improper question. In Greer, the Court noted that although there was no Doyle violation, it had to consider whether the prosecutor's attempt to violate Doyle constituted prosecutorial misconduct that " 'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.' " Greer, 483 U.S. at 765 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). That depended on whether the prosecutor's question was"of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer, 483 U.S. at 765 (internal quotation marks and citations omitted). The Greer Court determined that "[t]he sequence of events in this case --a single question, an immediate objection, and two curative instructions--clearly indicates that the prosecutor's improper question did not violate [the defendant's] due process rights." Id. at 766. We do not know whether the prosecutor tried to violate Doyle, in part because we do not know whether Johnson received Miranda warnings. Nevertheless, we will assume arguendo that the prosecutor intended for his question to do so. As in Greer, defense counsel's immediate objection and the District Court's prompt curative instruction demonstrate that the prosecutor's single question did not deny Johnson his right to a fair trial.

B. Other Issues

1. Disclosure of confidential informant's identity

10. We emphasized the importance of a curative instruction (and distinguished Greer) in Hassine v. Zimmerman, 160 F.3d 941 (3d Cir. 1998), which found a Doyle violation where"the trial court gave no curative instructions at all" after the prosecutor asked three questions that implicated the defendant's post-arrest, post-Miranda-warnings silence. Id. at 948.

14

in his first trial because the District Court denied his requests before and during the trial to order the Government to disclose the identity of the confidential informant.

To encourage citizens to report criminal activity, the Government has a "privilege to withhold from disclosure the identity of persons who furnish information" regarding illegal activity. Roviaro v. United States, 353 U.S. 53, 59 (1957). A defendant can overcome this privilege if he demonstrates that disclosure "is relevant and helpful to [his] defense" or "is essential to a fair determination" of his guilt. Id. at 60-61; United States v. Brown, 3 F.3d 673, 679 (3d Cir. 1993); see also United States v. Jiles , 658 F.2d 194, 197 (3d Cir. 1981) (stating that where "the informant was not an active participant or eyewitness, but rather a mere tipster," his identity ordinarily need not be revealed). We review the District Court's refusal to order disclosure of the confidential informant's identity for abuse of discretion. Brown, 3 F.3d at 679.

Johnson has not provided any reason to believe that disclosure of the informant's identity would have helped his defense. The informant's only involvement in this case was that he or she introduced the undercover officer to Osborne. After the officer met Osborne, they drove away, leaving the informant behind. Following fruitless forays to a residence and a mall, Osborne found willing salesmen in Johnson and Simmons, from whom she purchased crack cocaine. The informant was not present while Osborne and the officer drove around looking to buy crack or during the transaction. Under these circumstances, the District Court did not abuse its discretion when it declined to order the Government to disclose the informant's identity.

 2. Sufficiency of the evidence

Johnson maintains that the evidence presented at his second trial was insufficient to support his convictions. In order to succeed on this claim, Johnson bears the"very heavy burden," United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995), of showing that, viewing the evidence in the light most favorable to the Government, no rational trier of fact could have found him guilty beyond a reasonable

15

doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Gumbs, 283 F.3d 128, 136 (3d Cir. 2002); United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001).

To obtain convictions on all three of the S 841(a) counts, the Government had to prove beyond a reasonable doubt that Johnson knowingly or intentionally possessed crack cocaine, cocaine, and marijuana with the intent of distributing them. 21 U.S.C. S 841(a). The Government could prove both Johnson's possession of these controlled substances and his intent through circumstantial evidence. See United States v. Voigt, 89 F.3d 1050, 1090 (3d Cir. 1996); United States v. Blackston, 940 F.2d 877, 891 (3d Cir. 1991).

Viewed favorably to the Government, the evidence showed that Johnson, when confronted by United States Marshals, appeared to stuff fifteen bags of marijuana in the taxi's back seat cushions. Sey, the only other passenger in the taxi, testified that the marijuana was Johnson's, not hers. A search at the police station discovered sixty-two small plastic bags of crack cocaine in his coat pocket. Further, a bag found at Sey's residence contained scores of small plastic bags filled with crack cocaine, cocaine, and marijuana, as well as extensive drug paraphernalia and a loaded gun. Documents bearing Johnson's name and fingerprint were in the bag, and Sey testified that it belonged to Johnson.

A reasonable jury could find from this evidence that Johnson possessed crack cocaine, cocaine, and marijuana for the purpose of distributing them. While Johnson insists that the jury should not have believed Sey's testimony regarding his ownership of the drugs, we will not disturb its credibility determination on appeal. See United States v. Kole, 164 F.3d 164, 177 (3d Cir. 1998). Because a reasonable jury could infer from the manner in which the drugs were packaged, not to mention the various drug paraphernalia, that Johnson intended to distribute the drugs he possessed, the evidence was sufficient to support his convictions on the three S 841(a) counts.

3. Denial of new trial motion

Johnson states that the District Court should have granted his new trial motion following his second trial

16

because the weight of the evidence did not support the verdict. Federal Rule of Criminal Procedure 33 provides that "[o]n a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require." A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it "believes that 'there is a serious danger that a miscarriage of justice has occurred--that is, that an

innocent person has been convicted.' " United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994) (quoting United States v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)). Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case. See United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000); United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988). We review the denial of a Rule 33 motion for abuse of discretion. United States v. Jasin , 280 F.3d 355, 360 (3d Cir. 2002).

Johnson's arguments regarding the denial of his new trial motion essentially rehash those presented in support of his insufficiency of the evidence claim. He offers no reason for us to doubt the District Court's conclusion that no miscarriage of justice took place. Thus the Court did not abuse its discretion when it declined to order a new trial.

4. Comment on Johnson's fugitive status

During his closing argument in Johnson's second trial, defense counsel asserted that it did not make sense that Johnson would have left his bags at Sey's residence because he had just met her. To rebut this argument, the prosecutor noted that Johnson testified that he was staying at Sey's residence in violation of a court order requiring him to stay at his mother's residence, and that the marshals had a warrant for his arrest. Therefore, the prosecutor argued, Johnson left his bags at Sey's residence because he was "on the run from the law" and could not return home for fear of being apprehended. This argument obviously was a legitimate response to defense counsel's attempt to create doubt as to the ownership of the bags. The prosecutor never mentioned the charges underlying the warrant for

Johnson's arrest. Instead, he simply called the jury's attention to Johnson's admission that he was a fugitive, which explained Johnson's motive for leaving his bags at Sey's residence.

5. Unanswered and withdrawn question about Johnson's prior bad acts

During the cross-examination of defense witness Kelvin Robertson, who testified that he went to Sey's residence on the day Johnson was arrested to buy marijuana from her, the prosecutor asked Robertson whether he ever obtained drugs from Johnson before May 1999. Robertson replied, "That's not important." After an objection by defense counsel, the District Court said it would allow the question, but the prosecutor withdrew it. The following exchange ensued:

> Q: Now, you just said, when I asked you that
> question, you said that's not important. When I

asked you, did you ever get drugs from [Johnson] before May of 1999? Did you hear yourself say that's not important when I asked you that question?

A: Yes, I did.

Q: Okay. That's because you knew that you had gotten drugs off of him and you knew he was a drug dealer, isn't that right?

At this point, defense counsel objected and a sidebar conversation occurred. Defense counsel suggested that the prosecutor was eliciting "other acts" evidence that was inadmissible under Federal Rule of Evidence 404(b). The prosecutor then agreed to withdraw the question, and the Court instructed the jury: "Members of the jury, disregard the last question. In any event, as I indicated to you at the outset, questions are not evidence. But to the extent that you have forgotten that instruction, I'm telling you to disregard the question." The prosecutor did not ask any other questions about whether Johnson dealt drugs in the past.

Johnson contends that the above sequence of events requires us to reverse his convictions from his second trial.

18

In its opinion denying Johnson's new trial motion, the District Court determined that, under United States v. Sampson, 980 F.2d 883 (3d Cir. 1992), the prosecutor's question was not improper because evidence of Johnson's prior drug sales to Robertson would have been admissible under Rule 404(b) to prove Johnson's intent. We need not consider whether the District Court's view was correct. First, the parties offer minimal analysis of this issue--each side's brief allots it only a single unilluminating paragraph. More importantly, even if we assume arguendo that the prosecutor's question was improper because, if answered, it would have elicited inadmissible evidence, any error was clearly harmless. Johnson does not seem to claim that the error is of constitutional proportions.11  A non-constitutional trial error "does not warrant reversal in circumstances where 'it is highly probable that the error did not contribute to the judgment.' " United States v. Tyler , 281 F.3d 84, 101 n.26 (3d Cir. 2002) (quoting United States v. Helbling, 209 F.3d 226, 241 (3d Cir. 2000)); see also Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

Under the circumstances presented here, it is most unlikely that the prosecutor's question had any effect on the outcome of the trial. Robertson never answered the prosecutor's question, so there was never any evidence introduced regarding Johnson's prior acts. See United States v. Farmer, 73 F.3d 836, 844 (8th Cir. 1996) (determining that prosecutor's improper references to defendant's prior bad acts were harmless where defense

counsel immediately objected, the witness never answered the question, and the prosecutor did not raise the topic during the remainder of the trial). To the extent that the jury may have thought the prosecutor's line of questioning suggested that Johnson had a history of dealing drugs, the

_____

11. Johnson's brief states once, in passing, that the prosecutor's question "deprived [him] of a fair trial." Appellant's Br. at 22. Even if this oblique reference suffices to raise the constitutional issue, it is clear that, when viewed against the backdrop of the trial as a whole, the prosecutor's question, though perhaps improper, did not " 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.' " Greer, 483 U.S. at 765 (quoting Donnelly, 416 U.S. at 643).

19

Court's prompt and unequivocal admonition that the prosecutor's remarks did not constitute evidence precluded any perceptible prejudice to Johnson. Cf. United States v. Sturm, 671 F.2d 749, 751-52 (3d Cir. 1982) (finding that immediate curative instruction averted prejudice to defendant from question regarding his pretrial efforts to seek immunity). Further, the prosecutor's line of questioning did not hint at anything the jury was unlikely to infer on its own--the large amount of drug paraphernalia found in Johnson's possession strongly suggested this was not the first time he possessed drugs with the intent to distribute them. Finally, the evidence against Johnson was powerful, and we find it highly unlikely that the prosecutor's question could have made any difference. Therefore, the prosecutor's question, if it was error, was harmless.

6. Use of prior convictions for impeachment

Johnson claims the District Court should not have allowed the Government to impeach him and defense witness Robertson with evidence of their prior felony convictions under Federal Rule of Evidence 609(a)(1), which allows such evidence to attack a witness's credibility. Rule 609(a)(1) provides that evidence that a criminal defendant has been convicted of a felony "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused," and that evidence that a witness other than a criminal defendant was convicted of a felony "shall be admitted, subject to Rule 403."12 We review the Court's decision to admit evidence under Rule 609(a)(1) for abuse of discretion. See United States v. Jacobs, 44 F.3d 1219, 1224-25 (3d Cir. 1995); United States v. Hans, 738 F.2d 88, 94 (3d Cir. 1984).

During Johnson's second trial, the District Court allowed the prosecutor to cross-examine Johnson about the fact of his felony conviction from his first trial. It reasoned that because Johnson's "credibility is important in the case," the

12. Federal Rule of Evidence 403 allows district courts to exclude relevant evidence if its potential to cause unfair prejudice substantially outweighs its probative value.

impeachment value of his prior conviction outweighed the risk of unfair prejudice. Following the Court's ruling, the prosecutor began his cross-examination of Johnson as follows:

> Q: Mr. Johnson, it's true, isn't it, that you have been convicted of a felony offense carrying a maximum potential penalty in excess of one year?
>
> A: Yes.
>
> Q: And that conviction is on appeal right now, isn't it?
>
> A: Yes.

The prosecutor then questioned Johnson about the events of May 27, 1999. He never asked Johnson about the nature of the offense for which he was convicted. Pursuant to the prosecutor's request, the Court instructed the jury that Johnson's prior conviction was being introduced solely to impeach his credibility, and that it could not be used for any other purpose. Under these circumstances, we will not disturb the Court's ruling. Credibility was a major issue at trial because Johnson's defense depended on the jury believing his story rather than Sey's, and evidence of a felony conviction is probative of credibility. See Fed. R. Evid. 609 advisory committee's note. At the same time, the risk of unfair prejudice was relatively slim, as the jury already knew that there was an outstanding warrant for Johnson's arrest when he was taken into custody. In this context, the Court did not abuse its discretion by allowing the prosecutor to ask Johnson about his previous felony conviction.

When Robertson testified, the prosecutor asked him, "And you have been convicted of a felony offense, haven't you?" Robertson replied, "Yes." Defense counsel did not object at this point. The prosecutor said he wanted to ask Robertson about the nature of his conviction, and only then did defense counsel object. During a sidebar conversation, the Court said it would not allow questions about the nature of Robertson's convictions because they were drug offenses, which do not involve deceit. Following the Court's ruling, the prosecutor got Robertson to admit that he had two felony convictions, but did not elicit information about

their nature. Because defense counsel did not object to the prosecutor's question about the fact of Robertson's convictions, we review the Court's handling of this issue for plain error under Federal Rule of Criminal Procedure 52(b).

"Under the plain error standard, 'before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " United States v. Campbell, 295 F.3d 398, 404 (3d Cir. 2002) (quoting Johnson v. United States, 520 U.S. 461, 466-67 (1997)) (alterations in original). The defendant bears the burden of showing that a plain error occurred. United States v. Syme, 276 F.3d 131, 143 n.4 (3d Cir. 2002).

Johnson has failed to carry his burden. Robertson's credibility was important because his version of events differed from Sey's and supported the story told by Johnson. Further, we fail to see how the fact of Robertson's prior convictions might have inflicted unfair prejudice beyond that which ordinarily accompanies evidence introduced pursuant to Rule 609(a)(1). Therefore, no error, and certainly no plain error, occurred when the District Court admitted evidence of Robertson's previous convictions.

7. Sentencing claims

The presentence report in Johnson's second trial listed his base offense level as 26. It recommended imposing a two-level enhancement for obstruction of justice pursuant to U.S.S.G. S 3C1.1, and another two-level enhancement for possession of a firearm in connection with the S 841(a)(1) counts. Adopting the presentence report's application of the Sentencing Guidelines, the Court found that Johnson's total offense level was 30 and that his criminal history category was II, findings for which the Guidelines prescribe incarceration of between 108 and 135 months. On May 24, 2001, the Court sentenced Johnson to 108 months on each count, to be served concurrently.

Johnson maintains that the District Court erred with respect to each of the two-level enhancements. To the

22

extent that Johnson raises issues of law, we exercise plenary review. See United States v. Day, 272 F.3d 216, 217 (3d Cir. 2001). We review for clear error the factual findings underlying each sentencing enhancement. See United States v. Perez, 280 F.3d 318, 352 (3d Cir. 2002); United States v. Boggi, 74 F.3d 470, 478 (3d Cir. 1996). " 'Factual findings are clearly erroneous if the findings are unsupported by substantial evidence, lack adequate evidentiary support in the record, are against the clear weight of the evidence or where the district court has misapprehended the weight of the evidence.' " United States v. Roberson, 194 F.3d 408, 416 (3d Cir. 1999) (quoting United States v. Roman, 121 F.3d 136, 140 (3d Cir. 1997)).

a. Enhancement for obstruction of justice

U.S.S.G. S 3C1.1 states in relevant part:"If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the . . . prosecution . . . of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct . . . increase the offense level by 2 levels." Perjury is one of the types of conduct to which this provision applies. U.S.S.G. S 3C1.1, cmt. n. 4(b) (2002). For the purposes of S 3C1.1, a defendant "testifying under oath or affirmation" commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993).

Sworn to tell the truth, Johnson testified that the coat he was wearing when he was arrested was not his, that he did not know the coat contained crack cocaine, that the drug-laden bag found at Sey's residence was not his, and that he had never seen that bag before it was introduced into evidence. The District Court found that by convicting Johnson on all three counts, the jury necessarily rejected these portions of his testimony. It further found that Johnson "was not truthful on material matters" and that he testified with "willful intent to not be forthcoming about the facts." The Court noted that Sey "testified directly contrary

23

to Mr. Johnson," and that the jury obviously believed her, not Johnson. Therefore, the Court concluded, Johnson perjured himself at trial. Indeed, it found that the record demonstrated Johnson's willful deceit with respect to material facts by "clear and convincing evidence," whereas the facts underlying a sentencing enhancement need only be proven by a preponderance of the evidence. See United States v. Watts, 519 U.S. 148, 156-57 (1997).

As with other factual findings, the District Court's determination that Johnson committed perjury at his trial cannot be set aside unless it was clearly erroneous. See Boggi, 74 F.3d at 478. Moreover, its findings must be evaluated in light of the principle that " 'a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.' " Id. at 478-79 (quoting United States v. Weston, 960 F.2d 212, 218 (1st Cir. 1992)). Because several portions of Johnson's sworn testimony at trial were irreconcilably inconsistent with the jury's verdict, we cannot conclude that the District Court clearly erred in finding that a S 3C1.1 enhancement was required.

b. Enhancement for possession of a firearm

U.S.S.G. S 2D1.1(b)(1) provides for a two-level enhancement if "a dangerous weapon (including a firearm) was possessed." A defendant who possessed a firearm during a drug offense should receive a S 2D1.1(b)(1)

enhancement "unless it is clearly improbable that the weapon was connected with the offense," e.g. , "if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." Id. cmt. n.3. The District Court increased Johnson's offense level by two because the marshals found a loaded .32 caliber revolver in one of his bags. Johnson did not contest this enhancement below, so our review is limited by the plain error standard set out above.

Johnson has failed to demonstrate plain error. The evidence shows that he possessed a loaded firearm in the bag containing the drugs and drug paraphernalia. He has not pointed to any evidence suggesting that it was"clearly improbable" that the loaded revolver in his bag"was

connected with" his drug trafficking. See id.  ("The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons."). That the S 924(c) charge was dismissed on the Government's motion is irrelevant. Cf. Watts, 519 U.S. at 157 ("hold[ing] that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"). Finally, we reject Johnson's suggestion that, under Apprendi v. New Jersey, 530 U.S. 466 (2000), 13 the Government had to prove beyond a reasonable doubt that he possessed the revolver, as his sentence of 108 months did not exceed the statutory maximum of 240 months. See 21 U.S.C. S 841(b)(1)(C); United States v. Sanchez-Gonzalez, 294 F.3d 563, 565 (3d Cir. 2002).14

III. Conclusion

For the foregoing reasons, we affirm Johnson's convictions and sentence.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

---

13. Apprendi held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

14. For the same reason, we cannot accept Johnson's assertion that the District Court's finding that he possessed more than five grams of crack cocaine somehow implicates Apprendi. Johnson clings to the extraneous fact that 21 U.S.C. S 841(b)(1)(B) provides for a maximum sentence of 480 months. As noted in the text, however, Johnson was sentenced under S 841(b)(1)(C), which "does not base the sentence on drug

quantity," Sanchez-Gonzalez, 294 F.3d at 565, and his sentence was less than the maximum 240 months permitted by that subsection, see S 841(b)(1)(C), thus rendering Apprendi  irrelevant.