**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1793
_____

UNITED STATES OF AMERICA

v.

LOUIS CATARRO,
            Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. Action No. 1-13-cr-0074-002)
District Judge: Honorable Renee Marie Bumb
_____

Submitted Under Third Circuit LAR 34.1(a)
March 8, 2018
_____

Before: McKEE, AMBRO, RESTREPO, *Circuit Judges*.

(Filed: August 16, 2018)
_____

OPINION[*]
_____

RESTREPO, *Circuit Judge*.

Appellant Louis Catarro appeals from an order of the District Court denying his

motion for a judgment of acquittal and/or a new trial following his conviction for

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

conspiracy to commit wire fraud and conspiracy to commit money laundering. For the reasons set forth below, we will affirm.

**I**

Because we write solely for the benefit of the parties, we will recite only the factual and procedural history as is necessary for this opinion.

Louis Catarro, a licensed real estate agent in Wildwood, New Jersey, was indicted in connection with an alleged scheme to inflate property prices on mortgage applications by tens of thousands of dollars, unbeknownst to the lenders, in order to pay "kickbacks" to buyers outside of closing. During the relevant period, Catarro owned a ten percent share of Blue Ocean Realty with co-defendant Frederic DiAntonio. In 2005, Catarro was approached by mortgage broker, John Lucidi, who wanted to establish a business relationship with Blue Ocean. By mid-2006, Lucidi was operating an office out of Blue Ocean's building.

Sometime in 2006, Catarro became the real estate agent representing buyers of condominiums from real estate developer Jack Gartner. Like many real estate developers at the time, Gartner was experiencing the impacts of the downturn in the housing market. He agreed to give cash back to buyers at closing in order to sell his condominiums.

The record is unclear regarding who first approached whom with the cash back idea. Gartner's former real estate agent testified at trial that Catarro approached him with the offer that his mortgage broker, Lucidi, could arrange for 100 percent financing and cash back out of the closing price for buyers of Gartner's condos. Lucidi testified at trial that Gartner's agent approached him and Catarro at a flag football game in North

2

Wildwood with Gartner's offer to drop the prices on his units and give the difference back in cash. When Catarro asked Lucidi whether the idea was legal, Lucidi responded that it was a "gray area." App. 87. Lucidi testified that Catarro nonetheless agreed to move forward.

Through the summer of 2006, Lucidi brought in several buyers, mostly his family members, personal associates, and friends, to purchase properties from Gartner. The closing prices were inflated by $30,000 to $40,000 to be paid by Gartner as a kickback to the buyers. These kickbacks were ultimately paid by the mortgage lenders but were not disclosed on the HUD forms used to apply for the mortgages.

Catarro acted as the real estate agent representing the buyers on each of these transactions and was paid a commission on each sale. He drew up the contracts of sale using the sales prices that were inflated to include the cash back amounts and documented the kickbacks using side addenda that were ultimately hidden and never disclosed to the mortgage lenders. Catarro went on to serve as the real estate agent on similar transactions with two other real estate developers in addition to Gartner, where Lucidi again brought buyers to the table who were given undisclosed cash kickbacks outside of closing.

Lucidi advised his buyers to use the cash back payments they received plus rental income to pay the mortgage until the property could be "flipped," or resold at a profit. Catarro then represented the original buyers to resell the properties. These transactions also included cash back payments to the new buyers outside of closing and a commission for Catarro. Eventually, Catarro stopped putting the side addenda with the cash back

3

amounts on Blue Ocean letterhead and started recording the payments on blank letterhead instead. Later, he began writing the addenda as fictitious credits for rental payments or construction costs, or as deposits that in reality were never paid. DiAntonio and Catarro eventually agreed to remove the addenda from their files entirely.

Discussions among the conspirators often referred to the transactions as a "gray area," analogous to legal rental or furniture credits paid to buyers outside of closing. App. 106, 109, 276, 419–21, 350. However, Lucidi admitted at trial to knowing the deals were unlawful. Moreover, Lucidi testified that, in the spring of 2006 shortly before Lucidi set up his office at Blue Ocean, Catarro and DiAntonio accompanied Lucidi to an ethics course for mortgage brokers in Florida where they learned that "the buyer is not supposed to walk away from the settlement table with any money." App. 110-11. HUD guidelines confirm that "a buyer can't walk away from the settlement table with cash." App. 101. A real estate agent instructor further testified that the practice of "kiting the deal," or inflating the sales price on a contract, is taught to real estate agents as "obviously committing fraud." Supp. App. 63-64.

Sometime in 2006, John Bruno, a sales agent at Blue Ocean Realty who worked for Catarro and DiAntonio, approached DiAntonio with concerns about the cash back deals. Bruno testified at trial that, in a meeting with Catarro, DiAntonio, Lucidi and others to discuss the cash back arrangement, he asked Lucidi if the payments were legal. When Bruno was not convinced by Lucidi's "gray area" response, he asked if the lenders were being informed about the cash back arrangements. Bruno testified that Lucidi responded simply: "no." App. 2039. At this point Bruno withdrew from any involvement

4

in the transactions, saying, "I am not in a position to continue with this. So what I want you guys to do is take my name off all of this information. I cease and desist from proceeding with this." App. 2039; 2042. Lucidi also provided testimony about this meeting at trial. Lucidi testified that Catarro reacted to Bruno's concerns by saying, "if anything ever comes of it, we just deny it."[1] App. 252-53.

In 2013, Catarro was one of four persons charged in a three-count indictment alleging conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and making false statements to HUD, in violation of 18 U.S.C. § 1010. Two co-defendants pled guilty, while Catarro and co-defendant DiAntonio proceeded to a joint jury trial. The jury found Catarro guilty on the counts of conspiracy to commit wire fraud and money laundering and not guilty of making false statements to HUD. Catarro's motions for acquittal and for a new trial were both denied, and he was sentenced to 37 months' imprisonment and three years of supervised release on each count to run concurrently. Catarro timely appeals, arguing that there was insufficient evidence to support his conviction by a reasonable jury and that, as a result, his motions for acquittal and/or a new trial should have been granted.

---

[1] When asked at trial how Catarro reacted to Bruno's withdrawal from the deals, Bruno could not remember Catarro saying anything or his body language. **App. 2039-40.**

## II[2]

### A.    Motion for Acquittal

We review the denial of a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 *de novo*, applying the same standard as the District Court. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). When reviewing a challenge to the sufficiency of the evidence, the court applies a "particularly deferential standard," and will sustain the jury's verdict if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25 (3d Cir. 2013) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).

"Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133. "Only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. McNeill*, 887 F.2d 448, 449-50 (3d Cir. 1989), *cert. denied*, 493 U.S. 1087 (1990) (quoting *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir. 1970), *cert. denied*, 400 U.S. 1022, 91 S. Ct. 586, 27 L. Ed. 2d 634 (1971)).

The elements of conspiracy are "an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act, combined with

---

[2]    The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291.

intent to commit the underlying offense." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005) (quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir.), *cert. denied*, 475 U.S. 1024 (1986)). The *mens rea* of wire fraud requires evidence of the defendant's "specific intent to defraud," whereas money laundering requires the defendant's knowledge that a financial transaction "involves the proceeds of some unlawful activity" and "either an intent to promote the carrying on of specified unlawful activity or knowledge that the transactions were designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012); *United States v. Omoruyi*, 260 F.3d 291, 294–95 (3d Cir. 2001).

While it is the government's burden to prove each element of a conspiracy beyond a reasonable doubt, "[t]he elements of conspiracy . . . can be proven entirely by circumstantial evidence." *Brodie*, 403 F.3d at 134. A defendant's guilty verdict will not be sustained if it is based solely on "[s]light evidence of a defendant's connection with a conspiracy." *Id.* (quoting *United States v. Coleman*, 811 F.2d 804, 807–08 (3d Cir. 1987)). At the same time, "[i]n conducting the sufficiency inquiry, we do not view the government's evidence in isolation, but rather, in conjunction and as a whole." *Id.*

On appeal, Catarro disputes the sufficiency of the evidence only as to the element of specific intent to defraud. He asserts that no reasonable jury could have found this element beyond a reasonable doubt on the basis of the government's evidence. Additionally, he argues that the "substantive facts of the fraud" cannot be attributed to him because, as a real estate agent, he did not have any direct contact with the lenders.

7

This second contention disregards the basic idea of conspiracy, which makes a defendant liable for the acts of his co-conspirators so long as there is "an agreement . . . combined with intent to commit an unlawful act, combined with intent to commit the underlying offense." *Brodie*, 403 F.3d at 134; *see also* 18 U.S.C.A. § 1956(h) (conspiracy to commit money laundering); 18 U.S.C. § 1349 (conspiracy to commit wire fraud).

Turning then to Catarro's argument that he lacked the requisite intent to defraud, when viewed in the light most favorable to the prosecution, the evidence presented at trial was sufficient for a rational trier of fact to conclude that Catarro intended to defraud mortgage lenders by participating in the scheme to give undisclosed cash kickbacks to buyers at closing, taken from artificially-inflated real estate prices.

The jury could have concluded from, *inter alia*, Lucidi's and Bruno's testimony that Catarro had the requisite intent to defraud. Lucidi testified that Catarro responded to sales agent John Bruno's concerns about the cash back deals by saying, "if anything ever comes of it, we just deny it." App. 252-53. Similarly, the testimony of sales agent John Bruno, who immediately withdrew from the scheme when he learned, in the presence of Catarro, that lenders were not being informed of the kickbacks, could lead the jury to infer that Catarro similarly understood the deals to be illegal. In contrast to Bruno's forceful repudiation of any further involvement in the deals, testimony and documentary evidence at trial showed that Catarro remained involved in these transactions long after that meeting took place.

The jury could have also credited testimony regarding Catarro's changing practice over time regarding the sales addenda he prepared to document the kickbacks. At first,

8

these addenda contained straightforward descriptions saying that the seller would pay a certain sum to the buyer outside of closing, e.g., "Seller will pay buyer at settlement $30,000." App. 93. Testimony at trial and exhibits presented by the government showed that Catarro gradually changed his practice in drafting these addenda, first taking them off of Blue Ocean letterhead, and ultimately recording the cash back payments not as cash but as fictitious rental, construction, or deposit credits. For example, the government presented as an exhibit a later sales addendum drafted by Catarro that stated, "Seller will give a credit of 64,000 to buyer at closing for rental and furniture credit." App. 217. Lucidi testified that these credits did not exist.

Circumstantial evidence further supports a reasonable inference of Catarro's fraudulent intent, including Catarro's training as a real estate agent, which would have included education on the illegality of inflating sales prices, as well as evidence that he attended an ethics class for mortgage brokers where attendees were told that buyers are never permitted to walk away from the closing table with cash.

Cumulatively and viewed in the light most favorable to the prosecution, the evidence could support a reasonable inference that Catarro knew Lucidi was submitting fraudulent documents to lenders and that the kickbacks to buyers outside of closing were unlawful.

In denying the motion for acquittal, the District Court acknowledged Catarro's argument that "Lucidi had duped" him into believing that the deals constituted a "gray area," but concluded that weighing the credibility of this argument was a matter "for the jury to decide." Supp. App. 58. Sufficient evidence was presented for a reasonable jury to

9

conclude that Catarro was not duped, but rather, as an experienced real estate agent, understood that inflating the prices of real estate on sales contracts to enable sellers to give cash back payments to buyers at closing amounted to defrauding the lenders.

### B.    *Motion for a New Trial*

We review for abuse of discretion the denial of a motion for a new trial under Federal Rule of Criminal Procedure 33. *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008). The District Court may grant a new trial "if the interest of justice so requires," and will do so "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." Fed. R. Crim. P. 33(a); *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (internal quotation marks omitted) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir.1994)). "Motions for a new trial based on the weight of the evidence . . . are to be granted sparingly and only in exceptional cases." *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (internal quotation marks and alterations omitted) (quoting *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir.2003)).

The District Court found that the weight of the evidence did support Catarro's conviction and that, while the credibility of the government's key witness, Lucidi, was vigorously attacked by the defense, "the jury was in a position to weigh the testimony of Lucidi and at the end of the day . . . found the testimony to be credible." Supp. App. 76. *See Salahuddin*, 765 F.3d at 346–47 (affirming denial of motion for a new trial based on weight of the evidence, because, *inter alia*, the jury weighed witness credibility against defense attacks, and circumstantial evidence of conspiracy was sufficient to convict).

10

For the reasons articulated above, the District Court did not abuse its discretion in denying the motion for a new trial because the evidence was sufficient for a rational jury to find that the elements of conspiracy to commit wire fraud and money laundering, including the element of Catarro's intent to defraud, had been met.

## III

For the foregoing reasons, the judgment of the District Court is affirmed.