**JIMMY DAVIS, Appellant**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

D.C. Crim. App. No. 2002/085

District Court of the Virgin Islands

Division of St. Croix

April 3, 2007

STEPHEN BRUSCH, ESQ., St. Croix, U.S.V.I., *Attorney for Appellant.*

GABRIELLA HALEY, AAG, St. Thomas, U.S.V.I., *Attorney for Appellee.*

GOMEZ, *Chief Judge, District Court of the Virgin Islands*; FINCH, *Judge of the District Court of the Virgin Islands*; and HOLLAR, *Judge of the Superior Court of the Virgin Islands, Sitting by Designation.*

## MEMORANDUM OPINION

### (April 3, 2007)

In this appeal, we are asked to decide:

1) Whether the prosecutor violated the appellant's rights to due process guaranteed under the Fifth Amendment to the United States Constitution "by denigrating Appellant's credibility because of Appellant's post-*Miranda* failure to tell the police that "Goofy" had fired the shots," requiring reversal of the appellant's conviction.

2) Whether the appellant was denied his right to a fair and impartial jury when the court *sua sponte* excused a potential juror "Simply Because the Juror's Brother Was a Former Police Officer, Who, According to the Court, 'Was in a Lot of Trouble for Writing Bad Checks,' and

When the Court Excused Another Juror Without Making a Proper Inquiry of the Juror," requiring a new trial.

3) Whether the doctrine of transferred intent is inapplicable to the offense of assault with intent to commit murder, requiring reversal of the appellant's conviction on Counts I through 4.

[See Br. of Appellant at 2].

Although the prosecutor's cross-examination of the appellant seriously impinged on rights guaranteed under the Fifth and Fourteenth Amendments to the U.S. Constitution, such error was harmless and does not warrant reversal. Having fully considered the appellant's remaining arguments, we further determine they also present no grounds for reversal. Accordingly, for the reasons herein stated, we will affirm the appellant's conviction.

## I. STATEMENT OF FACTS AND PROCEDURAL POSTURE

### Facts of Crime

On the afternoon of December 23, 2001, Shan Francis ("Francis") was driving a small truck and approached the intersection of Estate Whim Road and the Queen Mary Highway (Centerline Road) on St. Croix, preparing to turn eastward onto the Queen Mary Highway. Francis' female companion, Erica Parilla ("Parilla") and their infant daughter, Shanadalis Francis ("Shanadalis"), rode in the cabin with Francis. Sean Petrus ("Petrus") rode alone in the bed of the truck. [Appendix ("App.") Vol. I at 145; 187-88]. The traffic was heavy in the area at the time. [*Id.* at 194].

As Francis' truck came to a stop and prepared to turn right onto the highway, multiple gunshots were fired from the back of another truck traveling past Francis, from east to west on the Queen Mary Highway. Francis, Petrus, and Parilla, who all previously knew the appellant, identified Davis as the only individual in the back of that truck. [App. Vol I. at 99-100, 190, 146-47, 278]. Francis and Parilla both knew Davis from childhood—Parilla knew him from the time she was a young child, as her aunt was married to Davis' father, and Francis attended elementary school with Davis. [*Id.* at 98-99; Vol. II at 422-23]. Davis' brother, Hector Davis, rode in the front cabin, along with the driver, Luis Rivera or "Bugsy".

Both Francis and Petrus said they saw Davis holding a gun; Francis saw Davis take aim and fire those shots. [*See* App. Vol. I. at 190-92; 144-47]. Although Parilla testified that Davis was the only person in the truckbed, she took cover as the shots rang out and did not see who fired the shots. [*Id.* at 100-01].

Multiple shots were fired, at least three of which struck Francis' vehicle in the windshield and door on the driver's side. [*Id.* at 103-05]. However, none of the four individuals were struck. The jury was permitted to view the truck at trial.

Several days after the shooting, Davis was arrested and charged with four counts of assault with intent to kill each of the occupants of Francis' truck: Francis, Parilla, Shanadalis, and Petrus. *See* 14 V.I.C. § 295(1) (assault first degree). He was additionally charged with reckless endangerment and unauthorized possession of a firearm during a crime of violence, in violation of 14 V.I.C. §§ 625 and 2253(a).

## Exculpatory Testimony

At trial, Davis took the stand and admitted he was riding in the back of the truck from which shots were fired, but said another man, whom he knew only as "Goofy," had fired those shots. [App. Vol. II at 420-21]. He also testified that Francis had engaged in a "shootout" with Goofy and that Davis had simply taken cover. [*Id.* at 421-22]. Neither the Government nor the defense called to the stand any of the occupants of the truck carrying Davis.

Davis admitted knowing Francis and Parilla but testified he had no ill-feelings toward them. [*Id.* at 432-34]. He also testified he saw only Petrus in the truck with Francis at the time of the shooting and was unaware of Shanadalis or Parilla. [*Id.* at 423].

On cross-examination, the Government attempted to impeach Davis with the fact that he had never told police about Goofy, despite the fact that the information would tend to exculpate him of the crimes. [*Id.* at 449-55]. The trial court overruled the defense's objections to such cross-examination and permitted the questioning, as well as several additional references to the appellant's silence by the prosecutor in closing arguments.

**Assault with Intent to Kill**

Davis was charged with having assaulted all four victims with the specific intent to kill each one. The jury was instructed on the elements of intent and specific intent. The trial court, at the government's behest and over the appellant's objections, also instructed the jury on the alternative theory of transferred intent for the charge of assault with intent to kill the occupants of Francis' vehicle. [App. Vol. II at 374-79; Supplemental App. at 674-76].

The jury returned guilty verdicts on all counts. Davis received concurrent sentences for his assault convictions under Counts I through IV. He was sentenced to a total of 15 years on the two remaining counts. This timely appeal followed.

## II. DISCUSSION

### A. Jurisdiction and Standards of Review

This Court has jurisdiction to review final judgments and orders of the Superior Court. *See* The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004) which repealed 4 V.I.C. §§ 33-40, and reinstating appellate jurisdiction in this Court);[1] Revised Organic Act of 1954 § 23A; 48 U.S.C. § 1613a.[2] We afford plenary review to constitutional claims and generally review the court's factual determinations for clear error. *See Quetel v. Gov't of V.I.*, 178 F. Supp. 2d 482, 484-85 (D.V.I. App. Div. 2001) (citations omitted); *Gov't of V.I. v. Albert*, 89 F. Supp. 2d 658, 663, 42 V.I. 184 (D.V.I. App. Div. 2001).

### B. Whether the Prosecutor's References to Appellant's Post-Arrest Silence Violated the Appellant's Right to Due Process.

#### 1. References to Appellant's Post-Arrest Silence Was Constitutional Error.

The most concerning and, indeed, most meritorious, issue raised by the appellant surrounds the prosecutor's cross-examination regarding Davis' post-arrest silence. Such cross-examination to impeach his

---

[1] Our jurisdiction in this regard was previously provided under 4 V.I.C. § 33.

[2] The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995 & Supp. 2000), *reprinted in* V.I. CODE ANN. 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

exculpatory testimony that another person nicknamed "Goofy" was the actual shooter, Davis contends, trampled on his constitutional due process right to a fair trial. In light of the well-established precedent on this issue, we determine that it did.

■ Impeachment through use of a defendant's post-arrest and post-*Miranda* silence has been held to violate the defendant's constitutional right against self-incrimination and right to due process, for it is the antithesis of the implicit assurances of *Miranda v. Arizona*[3] and the protections against self-incrimination. *See United States v. Hale*, 422 U.S. 171, 177-80, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975) (determining such questioning improper in federal prosecutions under Fifth Amendment); *Doyle v. Ohio*, 426 U.S. 610, 617-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (holding questioning impermissible in state prosecutions under Fourteenth Amendment); *see also, Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). The impermissible boundaries of this questioning go to the defendant's failure at the time of arrest to discuss the facts of the crime, after having been given *Miranda* warnings.[4] *See Doyle*, 426 U.S. at 619 (noting, however, that post-arrest statements may be used for impeachment if inconsistent with trial testimony); *see also, United States v. Agee*, 597 F.2d 350, 353-55 (3d Cir. 1979) (no violation where defendant does not invoke his Fifth Amendment privilege to remain silent after arrest and then offers inconsistent testimony at trial).

This type of questioning to refute a defendant's exculpatory version of events, courts have repeatedly held, goes to the very heart of the defendant's defense and is, additionally, inconsistent with the spirit of

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 467-473, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] *Doyle* is generally applicable only where *Miranda* warnings are given, and it is the Government's burden to establish that no *Miranda* warnings were given and that *Doyle* protections are, therefore, applicable. *See United States v. Cummiskey*, 728 F.2d 200, 205-206 (3d Cir. 1984) (remanding for determination); *see also, United States v. Johnson*, 302 F.3d 139, 146 (3d Cir. 2002) (noting *Hale-Doyle* protections applicable only to post-*Miranda* silence).

The Government has not raised that issue in its brief, nor was evidence offered at trial to refute the defendant's testimony that he was, in fact, given *Miranda* warnings at the time of his arrest. Therefore, there being no dispute that Davis was given *Miranda* warnings and that the prosecutor's references were to his post-*Miranda* conduct, we apply the principles stated in *Doyle. Id.*

the *Miranda* warnings, which caution arrestees of their right to remain silent. *See Hale*, 422 U.S. at 177; *United States v. Harp*, 536 F.2d 601, 602-03 (5th Cir. 1976) (noting that such errors rarely harmless); *United States v. Cummiskey*, 728 F.2d 200, 204 (3d Cir. 1984) (due process violated where references to silence strikes at heart of defense). This is particularly the case when the questioning is prolonged, and where the focus of the questions directly attack the defendant's exculpatory testimony at trial, suggesting that his prior silence supports an inference of a belated fabrication. *See Hale*, 422 U.S. at 180; *see also, Harp*, 536 F.2d at 602-03 (noting repetitive remarks and emphasis on silence); *Williams v. Zahradnick*, 632 F.2d 353, 361-62 and n. 13 (4th Cir. 1980) (noting that, "One reference is less damaging than four; a lengthy colloquy is more prejudicial than a brief one.") (citations omitted); *compare, Phelps v. Duckworth*, 772 F.2d 1410 (7th Cir. 1985) (noting single, brief reference coupled with curative instruction militated against reversal).

The rationale for precluding such references to a defendant's post-*Miranda* silence is the absence of any probative value of post-arrest silence, given the fact that there could be innumerable reasons for a defendant's silence following an arrest and *Miranda* warnings, rendering such silence necessarily ambiguous. *Doyle*, 426 U.S. at 619-20. As the Court enunciated in *Doyle*,

> The warnings mandated by [the *Miranda* decision], as a prophylactic means of safeguarding Fifth Amendment rights, require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.

*Id.* at 617-18 (citing *Hale*, 422 U.S. at 177) (internal citation omitted).

■ The following factors are considered in assessing alleged *Doyle* violations: 1) the use to which the prosecution puts the post-arrest silence; 2) whether the defendant or the prosecution initiated reference to the post-arrest silence, the latter being more egregious; 3) other evidence

indicative of defendant's guilt, including whether the evidence against the defendant was overwhelming; 4) the intensity and frequency of the reference; and 5) whether a curative instruction was given. *See, e.g., Greer v. Miller*, 483 U.S. 756, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (noting no *Doyle* violation where curative instructions given); *United States v. Johnson*, 302 F.3d 139, 148 (3d Cir. 2002) (no violation where only one question asked and objections sustained); *United States v. Massey*, 687 F.2d 1348, 1353-54 (10th Cir. 1982); *Phelps v. Duckworth*, 772 F.2d 1410 (7th Cir. 1985).

In this instance, after taking the stand and offering testimony that there was another man, to whom he referred as "Goofy," in the bed of the truck with him and who fired the shots, [App. at 421-22, 430-32], Davis was impeached with repetitive and lengthy questioning regarding his failure to report those purportedly exculpatory facts to police both pre- and post-arrest, as reflected in the following colloquy:

Q And after hearing all of the evidence that you have heard, you come in here today and you say there were some guy named Goofy in your car in the back with you and he was the one that fired the shots?

A Not my car. I was paying them to carry me to buy a water pump.

Q But you come in here and you said it was a guy named Goofy in the back of that truck and Goofy who fired the shots. Is that what you are saying ... Where is Goofy today?

A Me ain't know. I am in jail. ...

Q Is it also your testimony that you were unable to find Goofy in order to help you here in Court today?

A Yes.

Q You were arrested, sir, were you not approximately a week after this incident, December 23; is that correct?

A Afterward.

Q After you were arrested in this case, sir, you did not make any statements to the police. Did you concern yourself whether or not Goofy, and not you, fired the shots on December 23?

868

MR. MEADE: Objection, Your Honor.

THE COURT: Overruled.

Q (MR. GEOCARIS) Mr. Davis, do you understand the question?

A Repeat.

Q After you were arrested in this case you never made any statement to the police. Did you concern yourself that it was Goofy, and not you, that fired the shots on December 23?

A The police never asked me for no statement.

Q You understand my question?

A Yes. They say they don't have a warrant for my arrest.

Q My question was, did you ever make any statements to the police that it was Goofy, and not you, that fired the shots; yes or no?

A No.

Q And since the time of your arrest up until the present time, now April, have you ever supplied any information to the police about who Goofy is; where he can be found in relation to what you said happen here; yes or no?

[App. Vol. II at 426-27, 449-51]. At that juncture, defense counsel again objected, arguing at sidebar that the line of questioning was impinging on rights protected under the Fifth Amendment. [*Id.* at 451]. The court having overruled that objection, the prosecutor persisted in the same line of questioning:

MR. GEOCARIS: May I have the court reporter read back the last question please.

THE COURT: Court reporter will read back the last question.

(Reporter read back the last question.)

Q (MR. GEOCARIS) Mr. Davis, answer the question please.

A No. I didn't give no statement to the police.

Q About Goofy?

A About nobody. The police never ask me.

Q I understand. ...

[452]. On redirect, defense counsel elicited testimony from Davis that, after he was arrested he was told of his right to remain silent and understood that to mean that he did not have to talk to police unless an attorney was present. [App. at 455-56]. He also testified that he has remained imprisoned since his arrest.

In closing argument, however, the Government again drew emphasis from Davis' failure to discuss the facts of the crime with police prior to trial and inferred that this failure evidenced his guilt or, at minimum, a fabricated story:

> I want to talk a little bit about the defendant's testimony. The defendant said it wasn't him that shot at Mr. Francis' car that day with his baby in the car; with his girlfriend in the cab; it wasn't him. It was Goofy. It was the Goofy defense claims. It was this Goofy guy. Goofy person that did it ... It's up to you whether you believe what they say or not. You can take what you know and your ways of the world to decide whether the people who testify before you are telling the truth. Who have a motive in here to lie? Mr. Jimmy Davis does. He have a motive to lie, yes. He does, ladies and gentlemen, because he's brought up on charges. So for the first time we hear Goofy; don't know the person named Goofy. The only person Goofy I know is in Disney World. Goofy did the shooting ... Goofy defense doesn't fly.

[*Id.* at 493-94] (emphasis added). The Government again continued with this tact in its rebuttal argument, telling the jury:

> What does [Jimmy Davis] have to lose by inventing some person named Goofy notwithstanding the fact Erica, Shawn and Sean testified it was only Jimmy in the back of the truck. ... Jimmy has nothing to lose by inventing a character named Goofy and saying it was Goofy who fired the shots.
>
> Consider your own common experiences and common sense when thinking about on cross-examination. I asked Mr. Davis between January and April, now, have you ever supplied the police with any information concerning where Goofy can be found so the

police can arrest him? Where Goofy can be located? Have you ever given? No, no, no. Can you believe that? Do you really feel if, God forbid, one of you all were in the same situation and if the truth was really the truth there was a guy named Goofy and somebody else fires the shots, would you not use everything within your power if it was the truth to notify the police to at least give them a statement that would exonerate yourself. No he didn't do it, but it's a fantom. [sic]. Goofy doesn't exist. I hate to use that word again, but more than that let's forget about that character. ...

He has nothing to lose by inventing a couple of characters putting him in the back of the truck ... and have you think maybe there is a guy named Goofy.

[App. at 521-523] (emphasis added).

■ The prosecutor's repetitive questioning directly attacked the defendant's exculpatory story that there was another person who was the shooter in the truck with him. These repetitive and emphatic references expressly invited the jury to draw an adverse inference of guilt and recent fabrication from 'Davis' post-arrest silence and were constitutionally impermissible under. *Doyle* and its progeny. That questioning, and the continued onslaught in closing and rebuttal arguments, went unchecked and without a cautionary instruction from the court.[5] Moreover, the prosecutor's line of questioning was not done in response to inconsistent testimony by the defendant regarding his post-arrest conduct and, there-fore, was not proper impeachment under *Doyle*. We accordingly find that the prosecutor's references to the appellant's post-arrest silence, both in cross examination and closing arguments, violated the appellant's right to due process. We must now decide whether that error was harmless.

## 2. Harmless Error

A *Doyle* violation warrants reversal only if it was not harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *Marshall*, 307 F.3d at 72-73. Under

---

[5] Contrary to the government's assertions, the standard instruction regarding burden of proof and presumption of innocence would not suffice to cure the error, because it did not specifically direct the jury not to improperly consider the appellant's silence as evidence of guilt or to infer from the prior silence that the exculpatory testimony was a fabrication.

this standard, the reviewing court must satisfy itself that there is no reasonable possibility that the error, viewed in the context of all the evidence presented, contributed to the guilty verdict, undermining confidence in the trial. *See Chapman*, 386 U.S. at 23; *Marshall*, 307 F.3d at 73-75 (considering weight of evidence at trial in determining error was harmless); *see also, United States v. Hasting*, 461 U.S. 499, 510-11, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983) (noting it must be determined whether, "absent the prosecutor's allusion to [the defendant's] silence and demeanor, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty"); *United States v. Balter*, 91 F.3d 427, 440 (3d Cir. 1996) (noting *that* "*Doyle* violations are harmless beyond a reasonable doubt where the evidence against the defendant is 'overwhelming'") (quoting *United States v. Dunbar*, 767 F.2d 72, 76 (3d Cir. 1985)); *cf. Hassine v. Zimmerman*, 160 F.3d 941, 958 (3d Cir. 1998) (noting that harmless error would not be found, "notwithstanding the weight of the evidence presented by the prosecution ... if, apart from the violation, the phase of the trial most directly impacted, namely, [the defendant's] testimony, presented a strong counter to the state's evidence").[6]

In the case *sub judice*, there was no dispute several shots were fired into the small truck carrying the four victims, and no dispute that Davis was in the back of the truck from which those shots emanated. The only dispute raised by the appellant was whether he was the person who fired those shots. Three of the victims testified to seeing only Davis in the back of the truck. Both Francis and Petrus also testified they saw Davis pointing the gun in their direction. Francis testified he subsequently saw

---

[6] *But see U.S. v. Wiley*, 29 F.3d 345, *349 (C.A.8 (Minn.), 1994) noting that harmless error analysis based on consideration of the following factors: [1] whether the government made repeated *Doyle* violations, [2] whether any curative effort was made by the trial court, [3] whether the defendant's exculpatory evidence is 'transparently frivolous,' and [4] whether the other evidence of the defendant's guilt is 'otherwise overwhelming.') (citations omitted; *United States v. Dixon*, 593 F.2d 626 (5th Cir. 1979) (weighing various non-exclusive actors, including the use to which the *Doyle* reference was put; curative instructions, frequency of references; what party originated the reference, and weight of evidence, in determining harmless error); *Williams v. Zahradnick*, 632 F.2d 353, 361-65 (4th Cir. 1980) (weighing factors, including plausibility of the defendant's exculpatory testimony, in determining harmless error); *Harp*, 536 F.2d 601 (applying apparent *per se* harmful error test where *Doyle* reference attacks defendant's exculpatory story).

Davis pull the trigger. Significantly, the victims all knew Davis prior to the incident; two of them knew him from childhood. There was, therefore, no issue of mistaken identity, and the reliability of the eyewitnesses' identification was not called into doubt.

■ This eyewitness identification testimony, by victims who had prior knowledge of Davis is, we think, significant evidence from which the jury could have found guilt. *See Balter*, 91 F.3d at 440 (finding that a *Doyle* error was not harmless beyond a reasonable doubt where sufficient evidence in support of the guilty verdict was presented at trial); *United v. Dunbar*, 767 F.2d 72, 76 (3d Cir. 1985); *Lieberman v. Washington*, 128 F.3d 1085, 1096 (7th Cir. 1997) (noting evidence of guilt was "so persuasive" that it was almost impossible to conceive how the *Doyle* violation could have contributed significantly to the jury's determination of guilt"). In the face of this unimpeached eyewitness evidence, we conclude the *Doyle* violation could not have affected the outcome of the trial. *See, e.g., Hassine*, 160 F.3d at 958 (finding harmless error, in *habeas* context, where error occurred in context of testimony that was, on its own, not likely to be viewed as credible and where defendant's story did not present a strong counter to prosecution's evidence).

## C. Discharge of Jury Members

The appellant additionally raises two challenges to the selection of his jury.

■■ We review the trial court's actions during the *voir dire* process, as well as its response to allegations of jury misconduct, for abuse of discretion. *See United States v. Console*, 13 F.3d 641, 666 (3d Cir. 1993); *United States v. Vega*, 285 F.3d 256, 265-66 (3d Cir. 2002); *United States v. Howell*, 231 F.3d 615, 627 (9th Cir. 2000); *see also, Mu'Min v. Virginia*, 500 U.S. 415, 427, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991) (noting broad discretion of court in inquiry to ferret out jury bias). In that regard, we note that *voir dire* is designed to assist in determining the ability of a *venire* person to fairly and objectively participate in the process as a juror, and that determination includes an assessment of "demeanor and credibility that are peculiarly within a trial judge's province." *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). A venire person's failure to answer, or to accurately answer, a question on *voir dire* also may properly factor into the trial court's assessment of credibility and may suggest bias. *See, e.g.,*

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 558, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (Brennan, J. and Marshall, J., concurring) ("Because the bias of a juror will rarely be admitted by the juror himself ... it necessarily must be inferred from surrounding facts and circumstances ... . Whether the juror answered a particular question on voir dire honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered" in determining bias).

■ The trial court, in conducting *voir dire,* "must rely largely on [its] immediate perceptions, and its *voir dire* determinations are entitled to deference on direct review." *Wainwright,* 469 U.S. at 428 (noting that a trial court is not required to enter express findings prior to excluding juror); *see also United States v. Salamone,* 800 F.2d 1216, 1223-24 (3d Cir. 1986) (discretion limited only by demand of fairness).

With these precepts in mind, we turn to the appellant's argument that the court's exclusion of a *venire* member and a juror deprived him of a fair trial.

### 1. Discharge of venire member

Appellant first contends the trial court erred in *sua sponte* excusing a member of the *venire* panel merely because her brother was a former police officer who had found himself in problems with the law.

As it neared completion of the *voir dire* process, the Court called *venire* member No. 24 to the bench and questioned her about her brother, who was a former police officer. [App. at 81-82]. During such questioning, the *venire* member denied any knowledge of her brother's legal troubles. Thereafter, the court struck the *venire* member over the appellant's objection. [App. at 84].

■ The record does not bear out the appellant's assertion that No. 24, identified as Ms. Roberts in the record, was excluded merely because her brother was a former police officer. Indeed, as the appellant acknowledges, several *venire* members had similar relationships and were not similarly excluded. [App. 66-82]. Rather, from the record, it is apparent the court was concerned with Ms. Roberts' failure to respond to relevant questions on *voir dire,* her failure, upon further questioning, to disclose her brother's legal troubles, and her denial of any knowledge of those circumstances. Indeed, the court, without objection from the appellant, also excused another panel member for failing to give a candid

response regarding her relationship to a police officer. [*See* Supplemental App. at 631-32].

Obviously, the record before us cannot paint a picture [of] Ms. Roberts' demeanor as the trial court conducted its questioning, or other factors bearing on the court's credibility determination. Accordingly, we will defer to the trial court's determination in that regard. *See United States v. Ferri*, 778 F.2d 985, 994 (3d Cir. 1985); *McDonough*, 464 U.S. at 558.

## 2. Discharge of Juror No. 2

Appellant next argues the court erred in striking Juror No. 2, identified on the record as Mrs. Sarauw, for sleeping. The defense objected at trial.

We note initially that the juror was not stricken merely for sleeping, as the appellant asserts. At trial, the government moved to strike Juror No. 2, after she was seen at the end of the day having a conversation with the appellant's father. The government further brought to the court's attention the fact that the juror had previously disclosed that she knew the appellant's father and that they resided in the same area, compounding its concerns regarding their interaction. The trial court also raised a concern that it had observed the juror sleeping throughout a substantial portion of the final jury instructions. The court then further inquired of that juror, who contended there was only a brief exchange when the appellant's father offered her a ride home.

During that inquiry, the juror singled out the prosecutor as the person who walked by as she spoke with the appellant's father and asserted that she had expressly delayed answering the appellant's father and had spoken loud enough to ensure the prosecutor heard the substance of their exchange. [App. at 475-76]. She further strenuously asserted that she had done nothing wrong and expressed strong sentiments about others suggesting that she had. Additionally, when questioned about how she was feeling during the time the court observed her prolonged slumber, the juror also revealed that she had been feeling ill with a flu and had taken medication. [App. at 475-76, 478].

In the arguments following the *voir dire* of Juror No. 2, the prosecutor expressed concerns that the combative demeanor of that juror during *the voir dire* suggested that she believed the prosecutor had reported her interaction with Appellant's father and that the juror

harbored prejudice against the government as a result. [App. at 481]. The court agreed and struck Juror No. 2, noting:

> I am striking her for two reasons. One, she was seen communicating with a relative of Jimmy Davis. Two, she slept throughout my entire delivery of the first portion of the jury instructions. Now, I can understand why. She was not feeling well and had taken medicine which was making her feel sleepy and actually; third reason, I do agree with the Government that she seemed very defensive and may now harbor a bias against the Government. For those reasons she is stricken.

[App. at 482]. Having reviewed the lengthy *voir dire* and the court's findings based on its observation of demeanor and credibility evidence, we determine the court did not abuse its discretion in striking Juror No. 2. *See, e.g., United States v. Vega*, 285 F.3d 256, 266 (3d Cir. 2002) (discussing presumptive prejudice arising from private communication, contact, or tampering, directly or indirectly, with a juror during a trial); *Console*, 13 F.3d at 666 ("[T]he trial judge has discretion ... to decide how to deal with a situation in which there is an allegation of jury misconduct ... [and] [t]his discretion extends to the determination of whether prejudice has been demonstrated.") (citation omitted); *United States v. Bradley*, 173 F.3d 225, 230-31 (3d Cir. 1999) (noting that a sleeping juror may properly be stricken under Federal Rule of Criminal Procedure 24(c), based on inability to perform their duties); *see also United States v. Freitag*, 230 F.3d 1019, 1023-24 (7th Cir. 2000).

## D. Whether the doctrine of transferred intent was improperly applied.

█ Under the common law, the transferred intent theory may be used to impose like criminal culpability where an intended act directed at another resulted in inadvertent harm to an unintended victim. *See e.g. United States ex rel. Jackson v. Follette*, 462 F.2d 1041, 1047 n.10 (2d Cir.), *cert. denied*, 409 U.S. 1045, 93 S. Ct. 544, 34 L. Ed. 2d 496 (1972); *Yates v. Evatt*, 500 U.S. 391, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991); *State v. Fekete*, 120 N.M. 290, 901 P.2d 708 (1995) (noting doctrine generally applied in "bad aim" situations and also protects the unintended victim in cases where the criminal statute matches the required specific intent with the specific victim); *State v. Wilson*, 71

Wash. App. 880, 863 P.2d 116, 121 (1993) ("The doctrine of transferred intent was created to avoid the specific intent requirement and thus hold the defendant accountable for the consequences of his behavior when he injures an unintended victim."), *rev'd in part*, 125 Wash. 2d 212, 883 P.2d 320 (1994). That doctrine was found necessary to avoid the absurd result of absolving from criminal culpability crimes for which it would otherwise be impossible to establish specific intent to harm the unintended victim.

Appellant contends the doctrine of transferred intent cannot be applied to the crime of assault with the intent to murder, because conviction for that crime requires that the assault must be committed upon the intended murder victim. Thus, Davis argues that in the absence of evidence he expressly shot at or intended to murder Petrus, Parilla or Shanadalis, his conviction may not lie.

Davis was convicted of assault with intent to commit murder as to each victim, under title 14, section 295(1). The V.I. Code defines "assault" as any "attempt[] to commit a battery; or ... a threatening gesture showing in itself an immediate intention coupled with an ability to commit a battery." 14 V.I.C. § 291. Accordingly, conviction for assault in the first degree, under section 295(1), requires proof that the defendant: willfully attempted or threatened to inflict bodily harm upon another, while having the present ability to inflict such an injury; that the attempt or threat to inflict injury was accompanied by an intentional display of force which gave the person reason to fear immediate bodily harm, and; that the defendant did so with the specific intent to kill the victim. *See Rivera v. Gov't of V.I.*, 42 V.I. 203, 210, *4 (D.V.I. App. Div. 2000) (noting that "intent to commit murder" has been construed to mean that "the defendant acted for the specific purpose of unlawfully killing").

 The element of intent presents a question of fact. *See Drew v. Drew*, 971 F. Supp. 948, 951, 37 V.I. 61 (D.V.I. App. Div. 1997) (citing *Gov't of the V.I. v. Frett*, 14 V.I. 315, 325 (Terr. Ct. 1978)); *see also Rosa v. Gov't of the V.I.*, D.C. Crim. App. No. 2001/068, 2006 U.S. Dist. LEXIS 76255, at 7 (D.V.I. App. Div. Sept. 22, 2006). As we have repeatedly explained, and as is by now hornbook law, the state of mind of the actor often cannot be shown through direct evidence and must, instead, be discerned from the facts and circumstances of the defendant's conduct. *See Rosa, supra*, 2006 U.S. Dist. LEXIS 76255, at 7 (citing *Gov't of V.I. v. Roldan*, 612 F.2d 775, 16 V.I. 683 (3d Cir. 1979), *cert.*

*denied,* 446 U.S. 920, 100 S. Ct. 1857, 64 L. Ed. 2d 275 (1980); *Gov't of V.I. v. Lanclos,* 477 F.2d 603, 9 V.I. 579 (3d Cir. 1973); *Gov't of V.I. v. Lake,* 362 F.2d 770, 776 (3d Cir. 1966)). Therefore, although the actor's intent cannot be inferred from the mere fact of the assault, it is well-settled that the nature or character of an assault, and the use of a deadly weapon or other manner reasonably likely to result in death are factors that may support a jury inference of intent. *See id.; see also Lake,* 362 F.2d at 776 (noting that "every sane man is presumed to intend all the natural and probable consequences flowing from his deliberate acts") (citing *Allen v. United States,* 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896)).[7]

 Here, it was shown that Davis fired multiple shots at the small truck in which all four victims rode. At least three of those shots struck that truck, one of which lodged in the windshield. Given the use of a deadly weapon and the manner of the assault, which could have reason-

---

[7] *Compare, Com. v. Hunter,* 434 Pa. Super. 583, 644 A.2d 763, 763-64 (1994) (rejecting argument that intent to injure under aggravated assault not shown where actor fired shots into home, from car and holding that intent shown as to each individual from act of discharging shots into occupied home where there exists great probability that any occupants would be harmed) (citing *Commonwealth v. Eaddy,* 419 Pa. Super. 48, 614 A.2d 1203 (1992) (finding intent to do serious bodily harm, under assault statute, where defendant, while targeting a specific individual, fired shots through window of home and struck another person inside the home)); *California v. Czahara,* 250 Cal. Rptr. 836, 203 Cal. App. 3d 1468 (1988) (where the conduct of defendant is such that it creates a "killing zone" or zone of harm, jury may reasonably infer direct intent to kill all individuals within that zone); *Ford v. Maryland,* 330 Md. 682, 625 A.2d 984, 994-95 (1992) (holding that conviction for throwing large rocks unto highway as vehicles passed may be had for multiple specific intent crimes from one act when it can be inferred that defendant intended to so harm each victim; intent shown by such widespread conduct that was reasonable likely to cause injury to both drivers and passengers); *see also Ruffin v. United States,* 642 A.2d 1288 (D.C. Cir. 1994) (upholding conviction for assault with intent to kill, holding that act of spraying a car with a hail of bullets permitted jury finding that the defendant had the intent to kill everyone in the path of bullets and all occupants); *Com. v. Rosado,* 454 Pa. Super. 17, 684 A.2d 605, 610 (1996) (defendant's act of firing shots into upper windows of building established intent to injure occupants, notwithstanding his assertions that he was unaware the victims used the second floor of their grocery business as their residence); *State v. Brady,* 745 So. 2d 954, 957-58 (Fla. 1999) (noting that act of firing deadly weapon toward several individuals supports finding of intent as to either one); *Ruffin v. United States,* 642 A.2d 1288 (D.C. Cir. 1994) (upholding conviction for assault with intent to kill, holding that act of spraying a car with a hail of bullets permitted jury finding that the defendant had the intent to kill everyone in the path of bullets and all occupants).

ably resulted in the death of all four occupants, the element of intent to kill as to each of the occupants was sufficiently established.

Moreover, the jury was instructed on the elements of the crime and that it was required to find that Davis acted with specific intent as to each victim:

> Before the defendant maybe [sic] found guilty of a crime the Government must prove beyond a reasonable doubt that the defendant committed the act which the law declares to be a crime and that the defendant intentionally committed the acts ... . An act is intentionally done if done deliberately, purposefully, and consciously, rather the product of a mistake or accident.
>
> Now, intent maybe proved by circumstantial evidence. Indeed, it can rarely be established by any other means. We simply cannot look into the head or the mind of another person. It is physically impossible to do that. So while witnesses may see and hear and so be able to give direct evidence of what a defendant does or fails to do, they cannot give an account of the state of mind with which the acts were done or omitted. But what a defendant does or fails to do may indicate intent or lack of intent to commit the particular offense charged.
>
> In deciding the issue of what a person knew or what a person intended at a particular time, you may consider any statement made or acts done by that person and all other facts and circumstances received in evidence which may help you to determine that person's knowledge or intent.
>
> You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted ... .
>
> The crimes charged in this case are serious crimes which require proof of specific intent before the defendant can be convicted. Specific intent as the term implies means more than the general intent to commit the act. To establish specific intent, the Government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all of the facts and circumstances surrounding the case.

[App. at 530-32]. The court then instructed the jury that, as to each victim, it was required to find that Davis assaulted the victims with the specific intent to murder each and, additionally, that it could consider culpability under the lesser-included offense only if such specific intent was not proven. [App. at 534-36] (separately outlining elements of the crime as to each victim). The court further instructed:

> If you find that the defendant assaulted Shawn Francis with the intent to murder him and by mistake or accident assaulted Sean Petrus, Erica Parilla [and] Shanadalis Francis, the element of intent is satisfied even though the defendant did not assault, with the intent to murder Sean Petrus, Erica Parrilla and Shanadalis Francis. The law transfers the intent from the original victim to any unintended victims.

[App. at 532].

In light of the trial evidence establishing the appellant's direct intent as to each victim, we need not resolve the broader issue whether the transferred intent doctrine is applicable to the charged crimes or where neither the intended nor unintended victim is harmed. Even assuming the trial court's instruction on that theory constituted error, however, such error would be harmless in light of the evidence pointing to a direct intent as to each victim, as outlined above. *See e.g.*, *Al Qaadir v. Gallegos*, 56 F.3d 70 (Table), 1995 U.S. App. LEXIS 13607 (9th Cir. June 2, 1995) (declining to reach issue of whether transferred intent instruction violated due process and finding that if erroneous, it was nonetheless harmless, where defendant's act of firing multiple shots into a truck in which his intended victim was riding was sufficient to support finding of intent to kill all the victims, even without resorting to transferred intent doctrine); *Affinito v. Hendricks*, 366 F.3d 252, 262 (3d Cir. 2004) (noting that, "Overwhelming evidence that a defendant acted with intent may also render an erroneous jury instruction harmless.") (citing *Kontakis v. Beyer*, 19 F.3d 110, 118 (3d Cir. 1994)); *Czahara*, 203 Cal. App. 3d 1468, 250 Cal. Rptr. 836 (holding resort to transferred intent doctrine was unnecessary where the conduct of defendant established intent to kill all individuals); *Ford*, 625 A.2d at 994-95 (holding convictions sustainable based on specific intent as to multiple individuals, although transferred intent inapplicable where crime is complete even before instrument of assault reaches its intended target);

*State v. Brady*, 745 So.2d 954, 957-58 (Fla. 1999) (noting that action of intentionally firing weapon in close proximity to two individuals established intent element, though only one was the intended target, and transferred intent instruction was unnecessary; jury did not rely on transferred intent doctrine where it convicted defendant of lesser-included offense, for which no such instruction was given); *Miles v. State*, 88 Md. App. 248, 594 A.2d 634, 639 (holding that transferred intent does not apply when there is no "unintended victim"), *cert. denied*, 325 Md. 95, 599 A.2d 447 (1991). We will accordingly affirm.

## III. CONCLUSION

In light of the foregoing, we will affirm the appellant's conviction. An appropriate order follows.

## CONCUR

HOLLAR, J., *concurring.*

I concur with the majority's affirmation of the Appellant's conviction because the U.S. Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) has undergone reform in recent years resulting in a transition of approaches dealing with the *Doyle* violations. Accordingly, I respectfully submit this separate analysis from that perspective.

### *Doyle* Violation

The United States Supreme Court in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), held that it was a violation of due process to impeach defendant's exculpatory testimony using his post-arrest and post-*Miranda* silence. Such practice has been deemed fundamentally unfair and a violation of the Fifth and Fourteenth Amendments to the U.S. Constitution for it betrays an "implicit assurance" that a Defendant would not be penalized for exercising his right to remain silent. *Wainwright v. Greenfield*, 474 U.S. 284, 289, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). To "use at trial the fact that (a Defendant) stood mute or invoked his privilege in the face of accusations" was undeniably error on behalf of the prosecution, *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S. Ct. 1602, 1625, 16 L. Ed. 2d 694

(1966), and said constitutional error has been labeled a *"Doyle"* violation.

## The *Chapman* Standard

In evaluating a constitutional violation, a determination must be made whether the error is harmless beyond a reasonable doubt, a standard enunciated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Although the defendant in *Chapman* tenaciously maintained that a violation of a constitutional right must always be deemed harmful and should result in an automatic reversal of conviction, the U.S. Supreme Court disagreed and placed the burden upon the state to prove that the constitutional error complained of did not contribute to defendant's conviction, thus reiterating its holding in *Fahy v. State of Connecticut*, 375 U.S. 85, 86, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963). Under the *Chapman* standard, the weight of the evidence within a case is viewed against the *Doyle* violation in order to resolve, "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705. If the Court can reach a conclusion that the evidence of guilt is "so overwhelming" that the constitutional trial error did not affect the ultimate outcome of guilt, then the error is deemed harmless.

## *Brecht* Holding

Significantly, the U.S. Supreme Court, in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 1712, 123 L. Ed. 2d 353 (1993), unequivocally identified a *Doyle* violation as a constitutional violation and not a violation of a prophylactic rule as stated by the Seventh Circuit Court of Appeals in *Brecht*, 944 F.2d 1363 (7th Cir. 1991). As a constitutional violation, *Doyle* was found to "fit squarely" within the trial error category where the "harmless beyond a reasonable doubt" standard was made applicable instead of a structural error category which required automatic reversal. *Id.* Thus, within "the setting of a particular case", some constitutional trial errors are subject to "harmless error" analysis and not a "blanket rule of automatic reversal" of the conviction. *Brecht*, 507 U.S. 619, 113 S. Ct. 1710, 1717, 123 L. Ed. 2d 353 (1993) (*citing Arizona v. Fulminante*, 499 U.S. 279, 307, 111 S. Ct. 1246, 1263, 113 L. Ed. 2d 302).

Moreover, the U.S. Supreme Court in *Brecht* narrowed the application of the *Chapman* standard to cases only on direct appeal. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 1712, 123 L. Ed. 2d 353 (1993) (direct review of state and federal criminal proceedings on claims of constitutional error are evaluated under the *Chapman* standard). In the final round of judicial review, *Brecht* was not a direct appeal but a *writ of habeas corpus*. Consequently, the *Chapman* standard was supplanted by a new criterion. Under the new *Brecht* standard, *habeas* relief could be granted on collateral review only if the constitutional trial error "had substantial and injurious effect or influence in determining the jury's verdict", a burden far more relaxed than the one articulated in *Chapman*. Under the new benchmark, Brecht's conviction was affirmed, despite the *Doyle* violation.

Lastly, even before *Brecht's* final trek to the United States Supreme Court, the Wisconsin Supreme Court, on direct appeal, evaluated the *Doyle* violation under the *Chapman* standard and affirmed the conviction. Significantly, the U.S. Supreme Court, in its collateral habeas review, never challenged or criticized the Wisconsin Supreme Court's findings of fact and ultimate decision to affirm Brecht's conviction on a direct appeal utilizing the *Chapman* analysis.

## Harmless Error Analysis: Different Jurisdictions

Several jurisdictions have delineated specific factors to be weighed in determining whether "harmless error" was committed. In *United States v. Dixon*, 593 F.2d 626 (5th Cir. 1979), the Court conducted its review on a direct appeal from the District Court for the Northern District of Florida. The decision of the lower court was upheld and the *Doyle* violation was deemed "harmless" by evaluating the verdict on a case-by-case basis in light of "the facts, trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." *Dixon*, 593 F.2d at 629. In affirming the Defendant's conviction, factors considered were: (1) the lack of prejudice in the jurors' mind (the reference was not directly linked to his exculpatory story); (2) the trial court's curative instructions to the jury; (3) the non-repetitive nature of the question (the prosecutor did not elaborate on Defendant's silence after the witness' testimony); (4) the fact that the Defendant opened-the-door by inferring his cooperation with the police; and (5) the weight of evidence augmenting Defendant's guilt. In *Williams v. Zahradnick*, 632

F.2d 353 (4th Cir. 1980), a *pre-Brecht* appeal was made of the lower court's denial of a *writ of habeas corpus* under the *Chapman* standard. A case-by-case determination was also used which weighed "the prejudicial effect of the improper evidence against the probative value of the properly admitted evidence" and noting that the "variables and weights to be assigned them vary in each case." *Id.* at 361. Citing a series of cases, the Court proceeded to outline the following factors to be weighed in evaluating "harmless error", however noting that the list was not "exhaustive" or "exclusive: (1) the use to which the prosecution puts the post-arrest silence (when the prosecutor's repetitive and emphatic attack is on the jugular of the defendant's case, it is rarely declared harmless); (2) who elected to pursue the line of questioning; (3) the other evidence indicative of guilt; (4) the intensity and frequency of the reference; and (5) the ability of the trial judge to grant a motion for mistrial or to give curative instructions. Applying those factors, the *Zahradnick* Court determined that the prejudicial effect outweighed the probative value on the basis that the prosecutor's four references upon appellant's silence was intended to lead "the jury to make inferences of guilt from defendant's silence." *Zahradnick*, 632 F.2d 353, 365 (4th Cir. 1980). Though the evidence against appellant was sufficient to sustain a conviction, the Court stated "it was not persuasive enough to tip the scale towards harmless error" and "must be balanced with appellant's *plausible* and *corroborated* alibi" defense; thus, the district court's decision was reversed and remanded for the issuance of a *writ of habeas corpus. Id.* The U.S. Supreme Court in *Greer v. Miller*, 483 U.S. 756, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987), however, found no *Doyle* violation where a single question was followed by an immediate objection, and two (2) curative instructions were given, since the prosecutor was not able to *use* Defendant's silence for impeachment purposes.

## The Third Circuit Approach

In *Hassine v. Zimmerman*, 1997 U.S. Dist. LEXIS 17043 (E.D. Pa.), the District Court looked at the evidence in its totality to assess Petitioner's application for a writ of habeas corpus under the new *Brecht* standard. Although the evidence was reviewed for any substantial and injurious effect or influence on the jury's guilty verdict, the Court, applying the same factors, also determined that due to the overwhelming nature of the direct and circumstantial evidence that the *Doyle* error

would have been harmless even under the *Chapman standard*, despite three (3) specific inquiries, three (3) sustained objections, the absence of any curative instructions or admonishment from the Court, and additional commentary during closing arguments. Thus, the application for *writ of habeas corpus* was denied. Hassine appealed the decision to the U.S. Court of Appeals for the Third Circuit. *See Hassine v. Zimmerman*, 160 F.3d 941 (3d Cir. 1998). The Third Circuit affirmed the Eastern District Court's denial of the application for *writ of habeas corpus* finding the *Doyle* violation was harmless because it did not have a substantial and injurious effect or influence in determining the jury's verdict due to the overwhelming evidence of Hassine's guilt and his lack of credibility separate and apart from the *Doyle* violation. *Hassine*, 160 F.3d 941, 959 (3d Cir. 1998). Even though, the Third Circuit, in *United States v. Cummiskey*, 728 F.2d 200 (3d Cir. 1984), deemed references upon Defendant's silence an attack upon the "heart of his case", the holding of *Cummiskey* rested upon the basic premise underlying a *Doyle* violation, which is the giving of *Miranda* rights and the Defendant's election of silence. By refusing to permit a presumption that *Miranda* warnings were given at the time of arrest, the Court remanded the case for an evidentiary hearing to establish whether *Miranda* warnings were given or not. Post-*Cummiskey,* however, and more recently, the Third Circuit has consistently used a "totality of the evidence" approach in evaluating whether there was a reasonable possibility that the evidence complained of might have contributed to the conviction when analyzing "harmless error" of the trial error variety under the *Chapman* standard. Given the foregoing, it is clear that the Third Circuit, in evaluating "harmless error" beyond a reasonable doubt, has swung the pendulum from the "jugular theory" analysis to a "totality of the evidence" or "overwhelming nature of the evidence" scrutiny.

### Operative Facts in Davis

The Government in its case in chief called the three (3) victims to the stand. They testified that Davis was the sole occupant in the back of the truck. [App. I at 99, 126, 171-172, 190]. Of the three victims, two testified that they saw Davis with a gun in his hand, and he aimed the gun at them. [App. I at 145, 191]. The victims were unequivocal concerning the identity of the appellant because they knew him, they grew up in Estate Whim with him, and attended the same "elementary"

school with him. [App. I at 99, 172, 230]. Detective Encarnacion testified that the truck, in which the victims occupied, sustained bullet holes and he collected a bullet projectile from one of the victims. [App. I at 310, 314-316].

On direct examination by his counsel, Davis advanced the exculpatory defense of mistaken identity. In stark contrast to the victims' testimony, appellant maintains that he did not fire the shots, "Goofy", who was seated next to him in the truck, did. While appellant readily admitted that he was present when the shots were fired, at the time and place alleged by the victims, he nevertheless contended that someone else did the shooting. Although maintaining there was a shootout between "Goofy" and the occupants of the other vehicle, appellant introduced absolutely no corroborating evidence to support such a scenario. Additionally, not one of the other identified eyewitnesses, alleged to be in the truck with the appellant, including his own brother, came forth to substantiate and advance appellant's version of the events and thus, exonerate him. The lack of evidence exposed the weakness and heightened the implausibility of Davis' defense, and raised serious issues of his credibility separate and apart from any inference the People may have drawn through a *Doyle* violation that "Goofy" was a phantom.

Much to its chagrin, however, the Government, at oral argument, was constrained to acknowledge that it unwittingly stepped over the thinly drawn line of demarcation between permissible and impermissible areas of impeachment when it used appellant's post-arrest, post-*Miranda* silence to infer the implausibility of the "Goofy" defense. As outlined in the majority opinion, the prosecutor made the error during during cross-examination of appellant. Davis vehemently argued that the effect of the prosecutor's questions and statements was to "grind [his] constitutional rights into constitutional detritus", "denigrate his credibility", and "carve up the core" of his defense. Notwithstanding the prosecutor's impermissible references to Davis' post-arrest, post *Miranda* silence, no "structural error" was committed which required an automatic reversal. The error was clearly a "trial error" subject to the "harmless error" analysis. The question to be resolved is "whether there existed a reasonable possibility that evidence complained of, [the *Doyle* violation], might have contributed to the defendant's conviction". After objectively reviewing the evidence in its totality, the answer must be a resounding "no".

Davis, from the onset, consistently and continually hedged and avoided admission to his prior felony conviction for theft of a stolen vehicle. When specifically asked if he was a convicted felon, Davis responded "no". When asked if he was convicted of a felony, Davis responded "yes, but I plead guilty". Upon further questioning, he stated "I don't call that a conviction. I plead guilty". Not receiving a responsive answer, the prosecution pursued the matter as previously outlined. Clearly, the prosecutor, in meeting his burden of proof, by necessity, had to carve into the defense by questioning the existence of "Goofy". There is absolutely nothing sinister about the prosecutor effectively and systematically dismantling the defense which, in this case, was inextricably intertwined with legitimately impeaching the defendant's credibility. Having utilized both measures, admittedly, the prosecutor laid a "royal shellacking" upon the appellant's defense.

To the extent the constitutional infraction had any initial impetus, Defense counsel effectively annihilated any adverse inference that could have been possibly derived from the *Doyle* violation by masterfully executing a re-direct examination of appellant. Davis' testimony through redirect examination made it abundantly clear that: (1) the police never asked appellant any questions; (2) upon his arrest, appellant was sent straight to jail; (3) Davis never had an opportunity to speak to the police; (4) since his arrest, Davis was incarcerated; and (5) Davis knew and understood his right to remain silent and his right not to speak to the police. Not only did the redirect examination by defense counsel deflect and nullify any improper inference regarding appellant's silence, but it was also tantamount to a curative instruction.

Further minimizing any adverse inference created by the prosecutor's impermissible questioning is the inapplicability of the underlying assumption within the United States Virgin Islands. The underlying assumption made as a result of a *Doyle* violation is that by failing to inform law enforcement of an exculpatory story, a Defendant has fabricated his defense and is thus not credible. One of the postulates that support this assumption is that an accused would ordinarily report to the police any exculpatory information. Unfortunately, in the United States Virgin Islands, the converse of that basic assumption appears to be true. Within the territory, it has been widely reported that there exists a general mistrust of the Virgin Islands Police Department (hereinafter "VIPD"). *See* Ananta Pancham, *VIPD Official Says Complaints Against*

887

*Police Have Tripled,* St. Thomas Source (August, 2005), http://www.onepaper.com/stthomasvi. The perception of law enforcement within this community is not favorable and information does not flow freely to the police department. This mistrust may emanate from the growing number of "rogue cops" that have been publicly exposed or because of the "leaks" that occur when confidential information is communicated to them. In 2003, a series of articles were written, under the header *"Deadly Force",* which chronicled various internal and external problems of the VIPD. *See* http://www.virginislandsdailynews.com. Consequently, non-cooperation with the VIPD from victims, defendants and witnesses appears to be the norm.

Given that backdrop, together with the masterfully executed re-direct examination of Davis by his attorney which effectively erased any adverse reference to his silence to police, the *Doyle* violation had undoubtedly a *de minimis* or non-existent impact in the minds of the St. Croix jury.

## Application of Operative Facts in Davis to the *Chapman* Standard

In reviewing the *Doyle* violations, in the case *sub judice,* the *Chapman* standard must be applied to the operative facts essentially utilizing the Third Circuit approach favoring "a totality of the evidence" analysis. On direct appeal, the Wisconsin Supreme Court, in *Brecht,* 143 Wis. 2d 297, 421 N.W.2d 96, reviewed the *Doyle* violation under the *Chapman* standard using the following three relevant factors: (a) the frequency of the error; (b) the nature of the state's evidence; and (c) the nature of the defense. After weighing these factors, the Court concluded that the *Doyle* violation was harmless beyond a reasonable doubt. In evaluating the frequency of the error, the Wisconsin Supreme Court identified only four (4) *Doyle* violations contained in two (2) pages of a nine hundred (900) page transcript or, measured in temporal terms, a "few minutes in a four day trial in which twenty-five (25) witnesses testified" and ruled those improprieties to be infrequent, *de minimis* and non-excessive. *Id.* at 317.

In *Hassine,* 1997 U.S. Dist. LEXIS 17043 (E.D. Pa.), the District Court concluded that applying either the "new" *Brecht* or *Chapman* standards the error was harmless, since only three specific inquiries occurred in a trial that lasted ten (10) days and comprised 1,800 pages of testimony in which thirty-four (34) witness as were called to testify regarding Hassine's involvement in the conspiracy to commit murder. In

the case *sub judice,* there were four (4) inappropriate references during cross-examination, and one reference during closing arguments, comprising less than two pages of 663 pages of actual transcript or approximately a few minutes in a three (3) day trial, where the Government brought six (6) witnesses to testified against the Defendant.

In *Brecht,* the Wisconsin Supreme Court, found that: (1) the shooting was intentional as evidenced by the horizontal trajectory which was inconsistent with the defendant's (Brecht) testimony; there was a motive for the crime; (2) the victim told others that Defendant had shot him; the Defendant had demonstrated consciousness of guilt through flight; and (3) there was a lack of evidence to verify Defendant's story that he (the Defendant) fell down the stairs. *Brecht,* 143 Wis. 2d 297, 318, 421 N.W.2d 96. Similarly, the District Court in *Hassine,* outlined a chronology of events that produced overwhelming evidence of defendant Hassine's guilt. The nature of the evidence against Davis is likewise compelling. There were three (3) victims who placed Davis in the back of the truck. Two of those victims saw Davis with a gun in his hand. The same two victims saw Davis aim the gun in their direction. One victim testified seeing him pull the trigger. [App. Vol. I 191]. None of the victims testified as to anyone being on the back of the truck with Davis. Each of those victims knew him from when they all were children growing up in St. Croix. One victim was in elementary school with him. *A fortiori,* there was no case of "mistaken identity". Additionally, there was physical evidence to corroborate the victims' testimony that they were shot at, as evidenced by the bullet holes found along the victim's driver side of the vehicle, a projectile removed from the top of the vehicle's windshield, and pictures reflecting the same. Also one of the victims testified that there had been a previous altercation between himself and appellant's brother, Hector Davis, thus, establishing a motive for Davis' "retaliating" actions. [App. Vol. I 250-254]. No such motive was presented for "Goofy" to take such action. In fact, none of the victims knew an individual named "Goofy".

The nature of the defense in *Brecht* rested on the theory of "an accidental shooting". However, the Wisconsin Supreme Court noted that the defense was contradicted not only by physical evidence in the form of the horizontal trajectory of the bullet but by other strong circumstantial evidence as well. *Id.* at 318. Likewise, there was no corroborating evidence to support Davis' defense that it was not he but

889

someone else who fired the gun. Thus, the *Davis* jury was able to glean, from the testimony presented at trial, appellant's guilt through the overwhelming permissible evidence.

## Conclusion

The *Doyle* violation, the use at trial of the fact that a Defendant stood mute or invoked his privilege of his *Miranda* Right to remain silent, in the face of accusations, is categorized as a trial error, not a structural error and thus, not subject to automatic reversal. "Harmless error beyond a reasonable doubt" is the *Chapman* standard, utilized in direct appeals, to measure whether the prosecution's use of a Defendant's post arrest, post-*Miranda* silence may have contributed to a guilty conviction. Under the Third Circuit approach, the *Chapman* standard of "harmless error beyond a reasonable doubt" is measured by weighing on a case-by-case basis, "the totality of the evidence", to resolve "whether there was a reasonable possibility that the evidence complained of might have contributed to the conviction". If the Court concludes, from the record, that the evidence of guilt was overwhelming and the trial error could not have affected the integrity of the truth-gathering process of the trial as to render it unfair and impact upon the jury deliberations in its finding of guilt, then the error must be deemed harmless. Although the prosecutor's comment upon Davis' post-arrest *Miranda* silence was undeniably a *Doyle* constitutional violation, there was no reasonable possibility that it contributed to the conviction of guilt given: (1) the overwhelming evidence presented by the Government; (2) appellant's lack of corroboration in support of his alleged defense; (3) the curative effect-of the Defense counsel's redirect examination of defendant in removing any impermissible references created by Davis' post-arrest post-*Miranda* silence; (4) the negligible impact such statements had on a jury in the U.S. Virgin Islands; and (5) the similarity between the fact pattern regarding the *Doyle* error in the case *sub judice* to that in *Hassine v. Zimmerman*, 1997 U.S. Dist. LEXIS 17043 (E.D. Pa.), where the District Court denied *habeas* relief using the *Chapman* standard as well as the new *Brecht* standard and the Third Circuit affirmed the Eastern District's denial. *See Hassine*, 160 F.3d 941 (3d Cir. 1998).

Any inference drawn by the jury that the appellant's "mistaken identity" defense was a prevarication of truth and not worthy of belief

was reached totally independent of any *Doyle* violation that the prosecution may have committed. Clearly it was:

1. the Government's three (3) victims who identified appellant as the shooter;
2. the physical evidence of bullet holes in the vehicle they occupied;
3. the conspicuous absence of corroborative evidence to support appellant's defense;
4. appellant's refusal to unequivocally "own up" to his prior felony conviction;
5. the evidence of a motive that existed for Davis' action; and
6. the familiarity of the victims with appellant

that ultimately drove the "death knell" into appellant's defense. Thus, the prosecutor's reference to defendant's silence to police, though impermissible, was harmless beyond a reasonable doubt.

AND NOW, for the reasons more fully stated in a Memorandum Opinion on even date, it is hereby

ORDERED that the Appellant's conviction is AFFIRMED.