

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-28-2007

# USA v. Smith

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3635

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Smith" (2007). *2007 Decisions*. Paper 867.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/867

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

No. 06-3635

———

UNITED STATES OF AMERICA

v.

CHRISTOPHER SMITH,
                    Appellant

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 05-cr-00414)
District Judge: Honorable Sylvia H. Rambo

———

Submitted Under Third Circuit LAR 34.1(a)
June 8, 2007

Before: FISHER and GREENBERG, <u>Circuit Judges</u>, and POLLAK,[*] <u>District</u> <u>Judge</u>

———

OPINION

____

———

[*]  Hon. Louis H. Pollak, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

POLLAK, <u>District Judge</u>

Defendant-Appellant Christopher Smith appeals his prison sentence of thirty-two months on the grounds that the District Court erred (a) in the calculation of his sentence, (b) in not allowing withdrawal his guilty plea to conspiracy, and (c) in entering a sentence that was unreasonable. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1). For the reasons explained herein, we will affirm the sentence.

I.

Much of Smith's appeal concerns a factual dispute about his level of involvement in the conspiracy and in related activity. On October 19, 2005, Christopher Smith and Kimberly Bingaman were charged in a three-count indictment with conspiracy, bank fraud, and theft and possession of articles stolen from the United States mails. The government's allegations, as subsequently particularized at Smith's change-of-plea hearing, were as follows: Between April 26, 2005 and June 19, 2005, Smith and Bingaman stole four credit card "convenience checks"[1] from the mailbox of their neighbor, Denise Staub. Bingaman endorsed the checks and the defendants attempted to deposit them at various banks. Only one of the four checks was successfully negotiated.[2]

---

[1] Convenience checks are special checks issued by credit card companies to cardholders, allowing the cardholder to write the check against his/her line of credit.

[2] The first convenience check, in the amount of $7,500, was deposited into an ATM machine at a branch of the M&T Bank in Chambersburg, PA on April 27, 2005. It was negotiated into Bingaman's bank account. The second check, also in the amount of $7,500,

During this same time period, Smith and Bingaman acquired a credit card stolen from the mailbox of another neighbor, Brittany Hopkins, and thereafter made several credit card purchases.

On June 30, 2005, Bingaman was interviewed by a postal inspector about the stolen checks. She told the inspector that her boyfriend, Christopher Smith, had been the mastermind of the criminal scheme. She explained that Smith had brought the checks to her and asked her to sign them, telling her that they were loan checks and that she could not get in trouble. On one occasion, according to Bingaman, Smith accompanied Bingaman to the Orrstown Bank and instructed her to attempt to cash a check by telling the bank teller that the payee on the check was her mother. Bingaman continued that, on another occasion, Smith accompanied her to an ATM machine, where he gave her a stolen ATM card and PIN number and had her attempt to cash another of the checks through the ATM.

Smith initially pled not guilty, but then decided to change his plea pursuant to a plea agreement with the government. The plea agreement provided that Smith would

---

was deposited into an ATM machine at a branch of the M&T Bank in Chambersburg, PA on May 22, 2005. The third check, in the amount of $7,000, was attempted to be deposited into a new account in Bingaman's name at a branch of the Orrstown Bank in Chambersburg, PA on May 26, 2005. The fourth check, in the amount of $9,000, was deposited into an ATM machine at a branch of the M&T Bank in Greencastle, PA on June 19, 2005.

Only the first check was successfully negotiated. The second and third checks were not negotiated. The fourth check was initially negotiated into an M&T Bank account, which was then immediately frozen upon discovery of the bank fraud. *See* Appellant's Mem. at 7.

3

plead guilty to one count of conspiracy in violation of 19 U.S.C. § 371 and, in turn, the government would move at sentencing for the dismissal of the bank fraud count and the theft and possession count. A21.

On March 14, 2006, the District Court held a change-of-plea hearing. At the hearing, the government explained what evidence it would use if the matter were to proceed to trial. The government described how "one of the stolen checks was successfully negotiated by Bingaman, resulting in a loss of approximately $2,136.90. The other three attempts were unsuccessful resulting in no losses. These unsuccessful attempts entailed approximately $24,000 in stolen checks." A63.[3] Before accepting the plea, the court inquired whether Smith understood that the intended loss—as opposed to the actual loss—could be a factor in the sentencing calculation:

> **Court:** Do you further understand that your guideline will be driven by the amount of the loss and the loss could include the expected or the attempted efforts that you made to cash checks even though you didn't receive money? So the potential we're looking at here is probably over $25,000 of attempted loss. . . .
> **[Smith's attorney]:** Your Honor, that has been explained to Mr. Smith.

A65. The District Court thereafter accepted Smith's plea. A66.

In preparation for sentencing, the probation office prepared a pre-sentence investigation report (PSR). The PSR calculated the total intended loss from the four checks as $31,000. PSR at 4. Before sentencing, defendant submitted a memorandum

---

[3] The attempted loss of the successfully-negotiated check was $7,500, *see supra* note 2, but that was not discussed at the change-of-plea hearing.

4

objecting to the $31,000 loss figure, stating that "during the negotiations with the government leading to the signing of the Plea Agreement and in the statements made during the Change of Plea hearing, it is obvious that the government did not intend to charge Mr. Smith with the entire amount of the intended loss in the scope of the conspiracy but only with $24,000." A51.

Smith's sentencing was held on July 31, 2006, and the District Court inquired about Smith's objection to the total loss figure:

> **Court:** That last sentence, it says, during the negotiations with the Government, etc., etc., it is obvious that the Government did not intend to charge Mr. Smith with the entire amount of the intended loss in the scope of the conspiracy, but only with $24,000.
> **[Government]:** That is simply not correct, Your Honor. The $24,000 figure represented the Government's best information and estimate regarding the loss at the time, but the United States does not barter away parts of conspiracies. And if [Smith's attorney] had that impression, that impression was entirely erroneous.
> The Government provided information which confirmed some $24,000 in check fraud. It appears with the preparation of the pre-sentence report that, that amount grows by about $6,000, but at no time did the Government represent to [Smith's attorney] that it would not try to pursue relevant conduct that was part of the case.

A73–A74.

The District Court and the parties continued to discuss the loss figure, and the government stated that any confusion between the $24,000 figure and the $31,000 figure was based on the government's erroneous calculation of the aggregate loss.[4] The

---

[4] The government did not have the change-of-plea transcript with it during the sentencing. The transcript is part of the record on appeal. Review of the transcript makes it clear that the government calculated the intended loss from the three unsuccessful attempts

following colloquy ensued:

> **Court:** The problem I have is that, based on the plea transcript, apparently he was pleading to $24,000.
>
> **[Government]:** I don't think that's correct, Your Honor. I think that what it reflects is that, when [another government attorney] covered the plea and gave a basis, a factual basis, he used the erroneous figure that I had initially calculated, but that the plea colloquy will reflect that this Defendant understood that he faced any sentence up to the statutory maximum of five years.
>
> There was no stipulation in the plea agreement as to loss. There was, as I concede, an erroneous initial estimate as to what that loss would be. That erroneous initial estimate was off by some $7,000, which affects these guidelines by two offense levels. . . .
>
> **The Court:** I realize that he is subject to the maximum penalty, but at the same time, he knows that part of the sentence is going to be based on the guidelines. And if he was under the impression that he was pleading to $24,000, is that an intelligent and knowing —
>
> **[Government]:** I'm saying, if [Mr. Smith] ultimately believes that his plea was not knowing and intelligent, then we ought to litigate his right to withdraw that plea, and the Government then ought to have the opportunity to bring any other charges that the evidence would bear here, charges that the Government decided to forgo when the plea took place.
>
> So I think this Defendant has to make a judgment on what it is that he is asking for. What he is asking for right now is not an opportunity to withdraw his plea apparently, but an opportunity to reform and reframe his plea agreement.

A78–A80. Ultimately, the District Court ruled that "the Court will use the intended loss as to the entire conspiracy," which was $31,000. A124–A125.

At Smith's sentencing, Bingaman was called to testify, and the version of events she gave was markedly inconsistent with her original testimony to the postal inspector on June 30, 2005. At Smith's sentencing, Bingaman testified that she had planned the

---

to negotiate checks at $24,000, differentiating this loss from the $2,136.90 actual loss resulting from Smith and Bingaman's successful negotiation of the first check. A63. The disposition of the four checks is outlined *supra*, note 2.

6

check-cashing scheme without Smith's knowledge and that Smith hadn't taken any steps to endorse or negotiate any of the four checks. She further testified that when Smith accompanied her to the Orrstown Bank, he did not know that the check Bingaman was there to negotiate was a stolen convenience check. She claimed that it was only after the Orrstown Bank incident that she made Smith aware of her criminal enterprise. When asked why her account of the events had been so radically different when she was interviewed by the postal inspector, Bingaman testified that she had placed the blame on Smith "[b]ecause I was nine months pregnant [with Smith's baby], and [Smith] was already in jail, and I didn't want to go to jail." A96.

The District Court was not persuaded by Bingaman's testimony that Smith was a minor participant in the crime. To the contrary, the court determined that Bingaman's June 2005 statement to the postal inspector was more credible than Bingaman's July 2006 testimony at the sentencing hearing.

At the close of the hearing, the District Court sentenced Smith to a thirty-two month term of imprisonment.

## II.

Smith raises five arguments on appeal. Smith contends that the District Court erred in (1) calculating the loss caused by his crimes at $31,000; (2) raising the offense level two levels under U.S.S.G. § 2B1.1(b)(10)(C)(I); (3) failing to grant him a two-level downward adjustment under U.S.S.G. § 3B1.2(b); (4) failing to withdraw his guilty plea;

7

and (5) entering an unreasonable sentence.

We conduct a *de novo* review the District Court's interpretation of the sentencing guidelines, but review factual findings for clear error. *United States v. Johnson*, 302 F.3d 139, 153 (3d Cir. 2002). We review the sentence imposed for reasonableness. *United States v. Booker*, 543 U.S. 220, 261–62 (2005).

A.

Smith's first contention is that, while the District Court properly determined the base offense level for his conspiracy conviction under U.S.S.G. § 2B1.1(a), it erred in calculating the total attempted loss as $31,000 instead of $24,000. We disagree. The District Court made a factual finding that the aggregate loss figure was $31,000, and the ruling was not clearly erroneous.

Smith makes three arguments in support of his contention that the appropriate loss figure was $24,000. He contends that 1) "that the government, in good faith during the plea negotiations with Mr. Smith, used the intended loss figure of $24,000," leading Smith to believe that the $24,000 figure would be used in his sentencing calculation; 2) that at the plea hearing the government again used an intended loss figure of $24,000; and 3) that Bingaman's testimony at Smith's sentencing made it clear that Smith did not join the conspiracy until after one, and perhaps two, of the convenience checks had been negotiated or attempted to be negotiated, and so the intended loss from his relevant

8

conduct should be calculated accordingly. Appellant's Br. at 13.

We address the first two arguments together. At the change-of-plea hearing, the government described the loss as follows: "one of the stolen checks was successfully negotiated by Bingaman, resulting in a loss of approximately $2,136.90. The other three attempts were unsuccessful resulting in no losses. These unsuccessful attempts entailed approximately $24,000 in stolen checks." A63. It is evident that the $24,000 figure described the intended loss from the three unsuccessful attempts, in contrast to the actual loss from the one successful attempt, which was thought to be $2,136.90. At the time of the plea hearing, the "intended loss" of the first check was not discussed, but the court brought to Smith's attention that his "guideline will be driven by the amount of the loss and that loss could include the expected or attempted efforts that [he] made to cash checks even though [he] didn't receive money," and that the court was "looking at . . . probably over $25,000 of attempted loss." Because the $24,000 figure was subject to enlargement to include the intended loss from the first check—$7,500, *see supra*, note 2—the District Court did not err in making the factual determination that the entire intended loss was $31,000.[5]

To be sure, once the $24,000 figure was used at the plea hearing, both the

---

[5] The application note to § 2B1.1(b)(1) directs that loss is measured by the "greater of actual loss or intended loss." § 2B1.1 cmt. n.3. "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* n.3(A)(I). "Intended loss" is defined as "the pecuniary harm that was intended to result from the offense." *Id.* n.3(A)(ii).

9

government and Smith may have believed that this represented the aggregate loss.[6] But the parties never stipulated to a $24,000 intended loss in the plea agreement. To the contrary, the plea agreement stated that "[t]he defendant further agrees that any legal and factual issues relating to the application of the Federal Sentencing Guidelines to the defendant's conduct, including facts that support any specific offense characteristic or other enhancement or adjustment and the appropriate sentence within the statutory maximums provided for by law, will be determined at a sentencing hearing." A21; *see also* A29. ("The defendant understands that the Court is not a party to and is not bound by this agreement or any recommendations made by the parties. Thus, the Court is free to impose upon the defendant any sentence up to and including the maximum sentence of imprisonment for 5 years . . . .").

Smith further argues that the District Court should have credited Bingaman's testimony at sentencing that Smith joined the conspiracy after the first, and possibly the second, check had been sought to be negotiated, and thus the loss from the first check (or two) should not have been counted as part of Smith's relevant offense conduct. The District Court instead credited Bingaman's initial testimony to the postal inspector, finding that Smith had been involved in the entirety of the conspiracy and was thus

---

[6] At sentencing, the government told the District Court that its "initial assessment of the loss was $24,000 [;] that estimate was erroneous." Thus, even though the transcript of the change-of-plea hearing shows that the government never stated that the total loss figure was $24,000, we will assume that both parties could have operated under the mistaken assumption that the aggregate intended loss asserted by the government was $24,000.

10

responsible for the entirety of the loss.

The District Court did not commit clear error in crediting Bingaman's June 2005 statement to the postal inspector rather than the radically divergent account she presented at the July 2006 sentencing hearing. The District Court observed that Bingaman's earlier testimony to the postal inspector was closer in time to the criminal conduct and was less likely to have been influenced by Smith. A125. The court also found that Bingaman's June 2005 account made more sense in light of the parties' respective criminal histories—Smith had several prior convictions, including convictions for identity theft or forgery offenses, whereas "Bingaman . . . had no prior experience in this type of criminal offense." A125. Weighing the credibility of a witness's testimony is a determination a district court is best suited to make, and such determination is entitled to deference. *See* 18 U.S.C. § 3742(e) ("[In reviewing a sentence,] [t]he court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses."). We thus find that the District Court did not commit clear error by crediting Bingaman's earlier account of Smith's role in the criminal enterprise and finding that all four checks were part of Smith's relevant conduct.

## B.

In June 2005—while Smith and Bingaman were engaged in the convenience check conspiracy—they also acquired a credit card stolen from the mailbox of their neighbor, Brittany Hopkins. They used this card to obtain a duplicate copy of the credit card, which

11

they used to make several purchases. PSR at 2. Smith was charged in the Franklin County Court of Common Pleas with identity theft, *inter alia*, and pled nolo contendere as part of a plea bargain in January 2006.

In preparation for Smith's sentencing on the federal conspiracy conviction, the probation office reported the Hopkins conduct in the PSR. The PSR recommended, and the District Court imposed, a two-level increase under U.S.S.G. § 2B1.1(b)(10)(C)(I), because Smith's criminal conduct with regard to Hopkins involved what the guidelines refer to as "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." Smith objected to the increase at sentencing, contending that the government had not raised the issue of his crimes against Hopkins "either at the discovery or any of the discussions or negotiations" with Smith. A110. Smith's attorney raised the alternative argument that if the conduct relating to Hopkins was to be included as relevant offense conduct, then Smith's sentence should run concurrent to the sentence he would have to serve on the Franklin County charges. A110–A111. The government agreed that a concurrent sentence was appropriate because "those two sentences do embrace some of the same conduct." A119. The District Court found that the conduct pertaining to Hopkins was "appropriate relevant conduct pursuant to Application Note 8 of the Guidelines, Section 1B1.3," and increased the offense level

12

by two points.[7]

When a district court is sentencing a defendant, the court's first task is to

determine the applicable offense guideline section to be applied, based on the crime of

conviction. *Cf. Watterson v. United States*, 219 F.3d 232, 236 (3d Cir. 2000). In the case

of Smith, that was U.S.S.G. § 2B1.1(a)(2). The court then determines the base offense

level, at which point relevant conduct may be taken into account if it relates to "(1)

calculating the base offense level, (2) considering the specific offense characteristics set

forth in the particular guideline, (3) considering any cross-references contained in the

particular guideline, and (4) making any adjustments authorized by Chapter Three." *Id.* at

239 (quoting *United States v. Chandler*, 125 F.3d 892, 897–98 (5th Cir. 1997)). Such

relevant conduct must be proved by a preponderance of the evidence. *See United States

v. Watts*, 519 U.S. 148, 157 (1997). In the present case, the PSR presented ample

---

[7]     When determining what specific offense characteristics apply at sentencing, § 1B1.3 allows the district court to consider "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Application note 8 elaborates on the process by which a district judge evaluates whether an act is "relevant conduct" with the following example:

> The defendant engaged in two cocaine sales constituting part of the same course of conduct or common scheme or plan. Subsequently, he is arrested by state authorities for the first sale and by federal authorities for the second sale. He is convicted in state court for the first sale and sentenced to imprisonment; he is then convicted in federal court for the second sale. In this case, the cocaine sales are not separated by an intervening sentence. Therefore, under subsection (a)(2), the cocaine sale associated with the state conviction is considered as relevant conduct to the instant federal offense. The state prison sentence for that sale is not counted as a prior sentence.

*See also id.* cmt. n.9 (defining common scheme or plan and same course of conduct).

evidence that the offenses involving Brittany Hopkins were conducted concurrently with the convenience check scheme. It was thus relevant conduct under U.S.S.G. § 1B1.3, Application notes 8–9. Accordingly, we find no error in the District Court's consideration of Smith's "unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification" in the offenses against Hopkins as a relevant specific offense characteristic to increase his offense level under U.S.S.G. § 2B1.1(b)(10)(C)(I).

## C.

Smith next argues that the District Court erred in not granting him a two-level downward adjustment for being a minor participant in the criminal activity under U.S.S.G. § 3B1.2(b). Because the District Court's conclusion that Smith was not entitled to a minor-participant downward adjustment was based on its assessment of the credibility of Bingaman's testimony, it was a factual determination that we review for clear error. *See United States v. Isaza-Zapata*, 148 F.3d 236, 237 (3d Cir. 1998). "The district courts are allowed broad discretion in applying this section, and their rulings are left largely undisturbed by the courts of appeal." *Id.* at 238.

As discussed above, *see supra* Part II.A, the District Court's determination that Bingaman's earlier account of the events to the postal inspector was more credible than her account at sentencing was not clear error. Since Smith's claim that he was a "minor participant" is only supportable if Bingaman's testimony at the sentencing hearing is

14

believed, our earlier finding disposes of this claim as well. Accordingly, we do not find clear error in the District Court's decision to deny the minor-role downward adjustment.

## D.

Smith further contends that the District Court erred at sentencing by not withdrawing Smith's guilty plea. However, nothing in the record suggests that Smith moved to withdraw his guilty plea, and the court did not err in failing to withdraw the guilty plea *sua sponte*.

## E.

Smith's final argument is that the District Court erred by imposing an unreasonable sentence under 18 U.S.C. § 3553(a), *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Cooper*, 437 F.3d 324 (3d Cir. 2006). In *Booker*, the Supreme Court directed that appellate courts should review sentences for "reasonableness." 543 U.S. at 261–62. To determine if a district court acted reasonably in imposing a sentence, a reviewing court must consider whether the district court appropriately exercised its discretion by giving meaningful consideration to the relevant factors under 18 U.S.C. § 3553(a).[8] "There are no magic words that a district judge must

---

[8] The § 3553(a) factors are:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;

invoke when sentencing, but the record should demonstrate that the court considered the § 3553(a) factors and any sentencing grounds properly raised by the parties which have recognized legal merit and factual support in the record." *Cooper*, 437 F.3d at 332.

Having reviewed the record in Smith's case, we find no merit in Smith's argument that the District Court unreasonably calculated his sentence. The District Court properly considered the nature and circumstances of the offense and the need for the sentence to provide just punishment, reflect the seriousness of the offense, promote respect for the law, protect the public from the defendant, and afford adequate deterrence to others. 18 U.S.C. § 3553(a). The court noted that "a sentence at the high end of the custody range is necessary to adequately meet sentencing goals of providing a penalty and deterrence," especially since "prior terms of imprisonment and supervision have been unsuccessful in deterring him." A128, A129. Referring to Smith's criminal history, the

---

       (C) to protect the public from further crimes of the defendant; and
       (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
       (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced[;]
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also Cooper*, 437 F.3d at 329.

District Court further noted that Smith "preys on society by committing identity theft" and that "[s]ociety must be protected by removing him from the public for a period of time." A129. The District Court properly considered the history and characteristics of the defendant pursuant to 18 U.S.C. §3553(a)(1), taking into account that he was a "recidivist" who has been "involved with the criminal justice system since age 16." A129. Finally, the district court evaluated and ruled upon all issues and objections raised by Smith and his attorney.

The District Court's sentence was reasonable and we see no problem with the manner in which it conducted the sentencing process.

III.

For the foregoing reasons, we will affirm.